**Tomas Chapa YZAGUIRRE, et al., Appellants,**

v.

**KCS RESOURCES, INC., Appellee.**

No. 05–97–02020–CV.

Court of Appeals of Texas, Dallas.

June 27, 2000.

Case Ordered Published by Supreme Court

June 21, 2001.

---

Donato David Ramos, Person, Whitworth, Ramos, Borchers & Morales, Laredo, for appellant.

Charles Riles Roberts, William T. Armstrong, Jeffers & Banack, Inc., San Antonio, for appellee.

Before Justices MORRIS, WHITTINGTON, and BRIDGES.

## OPINION

BRIDGES, Justice.

Appellants [1] (Lessors) appeal a summary judgment granted in favor of KCS Resources, Inc.[2] In six issues, Lessors contend the trial court erred in (1) granting summary judgment in favor of KCS, (2) denying Lessors' motion for summary judgment, (3) excluding certain expert testimony on market value, and (4) failing to transfer venue or abate the case. We overrule Lessors' issues and affirm the trial court's judgment.

### BACKGROUND

In 1973, Lessors' predecessors granted three oil and gas leases covering land in Zapata County, Texas to KCS's predecessor, National Exploration Company (NEC). In 1977, these leases were pooled to form the 320 acre Jesus Yzaguirre Gas Unit (the Yzaguirre Unit). In 1979, NEC entered into a twenty year gas purchase agreement (GPA) with Tennessee Gas Pipeline Company (Tennessee). This agreement included both the Yzaguirre Unit and the adjoining Fantina Yzaguirre Unit (the Fantina Unit), which included many of the same lessors. Pursuant to this agreement, Tennessee agreed to purchase essentially all of the gas produced from the Yzaguirre Unit and Fantina Unit at escalating prices (the GPA price). At this time, the Yzaguirre Unit consisted of only one completed well (Well # 1).

In 1988, Lessors in the Fantina Unit sued KCS, Coastal Oil & Gas Corporation (Coastal), and Tesoro E & P Company, L.P. (Tesoro), the working interest owners in the Fantina Unit, alleging the leases had terminated for failure to develop and produce gas in paying quantities. The Fantina Unit lessors and KCS, Coastal, and Tesoro settled the lawsuit. Part of the settlement agreement included an amendment to the Fantina Unit leases that provided for an increase in the royalty.

In 1989, Tennessee filed a declaratory judgment action against KCS, Coastal, and Tesoro challenging its obligation to pay the GPA price for gas produced from both the Yzaguirre Unit and the Fantina Unit (the Tennessee suit). KCS, Coastal, and Tesoro were all working interest owners in the Fantina Unit but only KCS was the working interest owner in the Yzaguirre Unit. Initially in the lawsuit, Tennessee paid the GPA price to the working interest owners under a reservation of rights to recover for any overpayments. During this Tennessee lawsuit, KCS drilled and completed at least two additional wells (Well # 2 and Well # 3).[3]

---

1. Appellants include Tomas Chapa Yzaguirre (a/k/a Tomas Yzaguirre Chapa), Jose Edmundo de los Santos, Carlos de los Santos, Nori G. Galindo, Noemi G. Barrera, Nicasio Gonzalez III, Francisco O. Izaguirre, Amelia Izaguirre, Hermila Y. Gonzalez, Aida G. Yzaguirre, Hector Yzaguirre, Diana Yzaguirre Ramirez, Elva Yzaguirre Ramirez, Hortencia Yzaguirre Hinojosa, Eduardo Yzaguirre, Jr., Loreto Yzaguirre and Tomas Arriaga Yzaguirre.

2. During some of the relevant times in this lawsuit, predecessors of KCS were the lessees rather than KCS. These predecessors include National Exploration Company, Pomfret Production Company, Enercorp Resources, Inc. and the Lenape Resources Corporation. For convenience of the parties and the Court, we refer to all of these entities collectively as KCS.

3. As of June 1997, at least sixteen wells were drilled and completed in the Yzaguirre Unit

In a letter to Lessors enclosing royalty checks for January of 1993, KCS notified Lessors it would pay royalty for gas produced from Well # 1 based on the GPA price but would initially only pay the spot market price for Well # 2 and Well # 3 because of the pendency of the Tennessee suit. KCS stated in the letter it would retain the difference in price for Wells # 2 and # 3 at interest until the Tennessee suit was resolved. In 1994, while the case was on appeal, Tennessee and KCS reached an interim agreement. Pursuant to this agreement, Tennessee agreed to pay a portion of the GPA price without a reservation of rights. Apparently, this agreed price was higher than the market value price. It is undisputed that KCS paid royalties based on the sales proceeds from the GPA for Well # 1 until the lawsuit was filed on December 1, 1994. It is also undisputed KCS never paid any royalties based on the GPA for any of the other wells in the Yzaguirre Unit.

Following this interim agreement, Coastal and Tesoro filed suit against the Fantina Unit lessors seeking a declaratory judgment to determine whether the lessors were entitled to receive royalties based on actual GPA proceeds rather than current market value at the well. KCS intervened soon after the lawsuit was filed on behalf of its interests in the Fantina Unit. KCS also requested a declaration of its rights with respect to the Yzaguirre Unit and added several other lessors as parties to the suit who were not lessors in the Fantina Unit. Lessors counterclaimed alleging fraud, negligent misrepresentation, gross negligence, and conspiracy. They also alleged affirmative defenses of promissory estoppel, estoppel, quasi-estoppel, waiver, and laches.

The Lessors then filed suit in Zapata County and a plea in abatement in the

or on acreage pooled with acreage in the

Dallas County suit. Lessors also filed a motion to transfer venue in the Dallas County suit seeking to transfer the case to Zapata County. The trial court denied the plea in abatement and motion to transfer venue. During the pendency of the case, the trial court severed the suit into three separate cases. Two of the cases involved the Fantina Unit and the third case involved only the Yzaguirre Unit which is the subject of the present appeal.

KCS moved for partial summary judgment seeking a declaration that the leases provide for a royalty based on market value at the well. Lessors likewise filed a motion for partial summary judgment asking the trial court to declare the leases provide for a royalty based on the actual proceeds, or the GPA price. The trial court granted KCS's motion for summary judgment and declared the unambiguous language in the leases provides for royalty based on market value at the well.

KCS also filed a motion for partial summary judgment on Lessors' counterclaims and affirmative defenses. The trial court granted KCS's motion. Finally, Lessors and KCS filed cross motions for partial summary judgment on the effect of the division orders. The trial court granted KCS's motion and determined that the obligation to pay royalty based on market price was not affected by the division orders.

After the trial court issued the various partial summary judgments, the only issues that remained for trial were the determination of (1) market value at the well and (2) whether the Lessors were properly paid royalty based on market value at the well. The parties requested the trial court to determine the admissibility of certain expert testimony for Lessors relating to

Yzaguirre Unit.

market value at the well. The trial court ruled this testimony was inadmissible. The parties then stipulated that without this evidence, the parties have properly been paid "market value" and the trial court entered a final judgment.

## SUMMARY JUDGMENT

In issues one and two, Lessors contend the trial court erred in granting KCS's motions for partial summary judgment and also in denying their motions for partial summary judgment with respect to the royalty provision in the leases and the division orders. In their third issue, Lessors contend the trial court erred in granting KCS's motion for partial summary judgment on Lessors' counterclaims and affirmative defenses.

The standard of review in a summary judgment case is well established. *See Nixon v. Mr. Property Management Co.*, 690 S.W.2d 546, 548–49 (Tex.1985). To prevail on summary judgment, a plaintiff must conclusively establish all elements of his cause of action as a matter of law. *See Swilley v. Hughes*, 488 S.W.2d 64, 67 (Tex. 1972). Alternatively, the defendant, as movant, must either (1) disprove at least one element in each of the plaintiff's causes of action or (2) plead and conclusively establish each element of an affirmative defense. *See City of Houston v. Clear Creek Basin Auth.*, 589 S.W.2d 671, 678 (Tex.1979).

When both parties move for summary judgment, "[e]ach party bears the burden of establishing that it is entitled to judgment as a matter of law." *See Guynes v. Galveston County*, 861 S.W.2d 861, 862 (Tex.1993). When the trial court grants one motion for summary judgment and denies the other, we review all questions presented. *See Nationwide Property & Cas. Ins. Co. v. McFarland*, 887 S.W.2d 487, 490 (Tex.App.—Dallas 1994, writ denied). "The reviewing court should render such judgment as the trial court should have rendered." *Commissioners Court of Titus County v. Agan*, 940 S.W.2d 77, 81 (Tex.1997).

### 1. Royalty Provision

In issues one and two, Lessors contend the trial court erred in granting summary judgment on the ground that the leases and division orders provide for a royalty based on market value. Lessors assert the trial court's summary judgment is in error for two reasons: (1) the division orders required royalty to be based on the actual price received under the GPA and (2) the implied duty to market entitles Lessors to a royalty based on the best price reasonably available. We will discuss each of Lessors' reasons in turn.

The royalty provision in the 1973 leases states:

> The royalties to be paid by Lessee are: . . . (b) on gas, including casinghead gas or other gaseous substance, produced from said land and sold or used off the premises or for the extraction of gasoline or other product therefrom, the market value at the well of one-eighth [12 1/2%] of the gas sold or used, provided that on gas sold at the wells the royalty shall be one-eighth of the amount realized from such sale. . . .

Lessors and KCS agree the above provision in the 1973 leases provides for a market value royalty. In 1992, fourteen of the seventeen Lessors signed division orders covering production from the Yzaguirre Unit.[4] The parties dispute whether there

---

4. The division orders were signed by all appellants except Tomas Chapa Yzaguirre, Amelia Izaguirre, and Francisco O. Izaguirre.

was only one well or three wells completed and producing at this time. Further, Lessors claim KCS sent them the division orders but KCS contends it did not send these division orders to Lessors and has never paid royalties based on these division orders.

The division orders state:

> For gas taken hereunder, the undersigned will be paid the market value at the well or wells of such gas which for all purposes hereunder shall be considered the price received by Operator for such gas, under any presently existing or any future contracts for the sale of gas, at the delivery point, less, as operating conditions in Operator's opinion require, an amount sufficient to reimburse Operator for all costs incurred in making delivery of any such gas from the wellhead and shall include, but not by way of limitation, the costs of gathering, dehydrating, compressing, treating and transporting the gas.

Lessors contend the division orders changed the market value royalty into a proceeds royalty.

■ Under a market value royalty, the lessor receives a royalty based on the current market value for the oil and gas. In contrast, a royalty based on proceeds is calculated on what the lessee actually receives for the oil and gas. Lessors contend the language in the division orders that the market value at the well "shall be considered the price received by Operator for such gas" requires KCS to pay a proceeds royalty. If the leases and division orders require a proceeds royalty provision, Lessors would be entitled to a royalty calculated on the higher GPA price KCS actually received for the gas.

■ Division orders provide a means for distributing royalties by authorizing and directing "to whom and in what proportion to distribute funds from the sale of oil and gas." *See Gavenda v. Strata Energy, Inc.,* 705 S.W.2d 690, 691 (Tex.1986). But, division orders do not convey royalty interests. *See id.* Division orders also do not rewrite or supplant oil and gas lease contracts. *See Exxon Corp. v. Middleton,* 613 S.W.2d 240, 250 (Tex.1981). In this context, "[a]ny provision of a division order between payee and its lessee which is in contradiction with any provision of an oil and gas lease is invalid to the extent of the contradiction." TEX.NAT.RES.CODE ANN. § 91.402(h) (Vernon Supp.2000).[5]

■ Division orders may be binding on the parties with respect to payments made and accepted under them. *See Middleton,* 613 S.W.2d at 250. However, "[t]hey are binding only for the time and to the extent that they have been, or are being acted on and made the basis of settlements and payments and from the time that notice is given that settlements will not be made on the basis provided in them, they cease to be binding." *See id.*

■ Lessors acknowledge KCS "did not actually pay royalty on all gas based on the GPA price." Lessors contend, however, KCS did not repudiate its obligation stated in the division orders. Lessors therefore conclude "[t]he division orders were acted on and made the basis of settlements and payments even though actual royalty payments were not mathematically calculated from the GPA price." Lessors rely on the January 1993 royalty letter from KCS that explains how KCS would pay royalty during the pendency of the

---

5. This particular language of the Natural Resources Code is identical to the statute's language in 1992, when the division orders were signed. Therefore, for the convenience of the parties and the Court, we cite to the current version of the statute.

Tennessee lawsuit. Specifically, the letter states

The [royalty] check represents your unit participation based on the Tejas Gas Corp. spot market gas price for production from Well Nos. 2 and 3 and the contract price for production from Well No. 1. . . . Because of the [Tennessee] lawsuit, [KCS's] payments to Royalty Owners for the production from new wells are based on the Tejas spot market price. Funds in dispute with Tennessee that are attributable to Royalty Owner Interests in Well Nos. 2 and 3 are being retained by us at interest until the lawsuit is finally resolved.

According to Lessors, "the only reasonable explanation for the letter is that KCS recognized its obligation to pay royalty on the GPA price subject only to Tennessee's success in this suit."

KCS paid royalties on Well # 1 based on the GPA from 1979, before the 1992 division orders were executed, until this lawsuit was filed. Even assuming these payments were made in accordance with the division orders, the division orders would only bind KCS during the time and to the extent payments were made in accordance with the division orders. KCS is not attempting to recover the payments made under the GPA before the lawsuit was initiated. The lawsuit provided notice that KCS would not make future payments based on the division orders and effectively revoked any division orders. *See Middleton*, 613 S.W.2d at 251. After this time, KCS had no further obligations to continue payments based on the division orders, even if KCS was earlier obligated to make proceeds payments under the division orders.

Further, because KCS never made any payments to Lessors for Well # 2, Well # 3, or any subsequently drilled wells based on the division orders, the division

orders do not bind KCS to the higher proceeds royalty. Additionally, the 1993 royalty letter provided notice to Lessors that KCS would not make payments on the basis of the division orders. Therefore, even if originally binding, the division orders ceased to be binding at that point. The division orders cannot change the express terms of the leases, and therefore did not convert the market value royalty in the leases into a proceeds royalty.

■ Having concluded the division orders had no effect on the market value royalty provided for in the leases, we now turn to whether an implied covenant somehow entitled Lessors to a royalty based on the higher GPA price. All oil and gas leases include an implied duty to reasonably market. *See Amoco Production Co. v. Alexander*, 622 S.W.2d 563, 567 (Tex. 1981). Included within the implied duty to market is the duty to obtain the best current price reasonably available. *See Cabot Corp. v. Brown*, 754 S.W.2d 104, 106 (Tex. 1987).

■ The implied covenant to market does not alter the express terms of a lease. *See Amoco Production Co. v. First Baptist Church of Pyote*, 611 S.W.2d 610, 610 (Tex. 1980). In *Pyote*, the supreme court recognized the express terms of a lease take precedence over the implied covenant to market. The supreme court stated "[t]he parties can draft either a 'market value' or a 'proceeds' royalty provision, and their intent will be followed by the courts." *See id.* at 610. Contrary to the Lessors' contention, the supreme court has made clear the implied covenant to market does not convert a market value royalty into a proceeds royalty.

■ The leases provide for a market value royalty and the division orders do not amend or supplant the lease provisions. The implied covenant to market

will not interfere with the Lessors' and KCS's intent as expressed through the unambiguous terms of the leases. Allowing Lessors to obtain royalties on the GPA price would effectively negate the express market value royalty provision in the leases.

We conclude the summary judgment evidence established the leases provide for a market value royalty and neither the division orders nor the implied covenant to market alter the royalty provision. The trial court properly granted KCS's motions for summary judgment and properly denied Lessors' motions for summary judgment in declaring that the leases provide for a market value royalty. Accordingly, we overrule Lessors' first and second issues.

## 2. Affirmative Defenses and Counterclaims

In their third issue, Lessors contend the trial court erred in granting summary judgment in favor of KCS on Lessors' affirmative defenses and counterclaims.

### a. Affirmative Defenses

 Lessors alleged affirmative defenses of promissory estoppel, estoppel, quasi-estoppel, waiver, and laches. In the face of an unambiguous lease, past conduct or promises do not give rise to estoppel. *See Sun Oil Co. v. Madeley,* 626 S.W.2d 726, 734 (Tex.1981). For over forty years, Sun Oil paid the lessors a royalty greater than that provided for by the express terms of the leases. Further, an internal document revealed Sun Oil was aware of the overpayment but for various reasons it did not change the payments at that time. *See id.* at 733. The supreme court held that Sun Oil's conduct in paying the lessors more than they were entitled to did not give rise to estoppel or waiver. Based on the reasoning in *Sun Oil,* we conclude

the trial court properly granted partial summary judgment in favor of KCS on Lessors' affirmative defenses encompassing estoppel as well as waiver.

 Laches is an equitable remedy that prevents a plaintiff from asserting a claim because of a lapse of time. *See Fadia v. Unauthorized Practice of Law Committee,* 830 S.W.2d 162, 165 (Tex. App.—Dallas 1992, no writ). The two essential elements of laches are (1) an unreasonable delay by one having legal or equitable rights in asserting them and (2) a good faith change of position by another to his detriment because of the delay. *See Rogers v. Ricane Enterprises, Inc.,* 772 S.W.2d 76, 80 (Tex.1989). In *Sun Oil,* the supreme court held that Sun Oil was not estopped from bringing a lawsuit after forty years of overpayments. Here, Lessors claim KCS allegedly promised to pay royalties based on a calculation different from what the agreement provides, in connection with the settlement of a case involving the Fantina Unit, about five years prior to the lawsuit. Lessors also claim KCS acknowledged this promise to pay proceeds royalties in the 1993 letter to Lessors describing how royalties would be distributed. We conclude, based on *Sun Oil,* the summary judgment evidence conclusively disproves the unreasonable delay element of laches. We overrule Lessors' third issue on its affirmative defenses claims.

### b. Counterclaims

Lessors asserted counterclaims for fraud, negligent misrepresentation, gross negligence, and conspiracy. With respect to their counterclaim for fraud, lessors allege KCS made various fraudulent misrepresentations. Specifically, Lessors contend KCS represented Lessors would receive royalties based on the GPA price. Lessors further contend they relied on those fraudulent misrepresentations in

settling the Fantina Unit lease termination suit and in not filing their own declaratory judgment action first in Zapata County.

 KCS moved for summary judgment on the counterclaims. One of KCS's grounds for summary judgment was the general rule that tort actions are not cognizable in a suit on a contract. In *Formosa Plastics Corporation USA v. Presidio Engineers and Contractors, Inc.,* 960 S.W.2d 41, 47 (Tex.1998), the supreme court carved out a limited exception to that general rule, holding that a party may maintain an action for fraudulent inducement of a contract even where the only damages are contract damages. *See id.* To establish a claim for fraudulent inducement, a party must show (1) a material representation which was false, (2) which was either known to be false when made or was made without knowledge of its truth, (3) which was intended to be acted upon, (4) which was relied upon, and (5) caused injury. *See id.* The settlement agreement regarding the Fantina Unit included a clause whereby the parties stipulated that there was no other oral promise other than what was contained in the contract. The clause read as follows:

10. It is understood and agreed that this Settlement Agreement contains the entire agreement between the parties relating to all issues involving the Fantina Yzaguirre leases. No oral understandings, statements, promises or inducements contrary to this Settlement Agreement exist. This Settlement Agreement cannot be changed or terminated orally, and any modifications shall be recognized by the parties only if they are in writing and executed by the appropriate parties.

 In *Schlumberger Technology Corporation v. Swanson,* 959 S.W.2d 171 (Tex. 1997), the supreme court addressed the effect of a disclaimer on a fraudulent inducement claim. In *Schlumberger,* George and John Swanson entered into a three-phase contract with Sedco, Inc. to mine diamonds off the ocean floor. Schlumberger then acquired Sedco and formed Sedswan Diamonds, Ltd. Sedswan then entered into a joint venture with two other companies to pursue the mining project. Schlumberger then decided to sell Sedswan's interest in the joint venture. The Swansons sold their interest in the project to Schlumberger. In doing so, the Swansons agreed they were not relying on any statement or representation of Schlumberger, Sedco, or Sedswan. *See id.* at 174. Schlumberger then sold Sedswan's interest to the remaining joint venturers. The Swansons sued Schlumberger for fraudulently inducing them to sell their interest for an undervalued price.

The supreme court held the disclaimer of reliance contained in their agreement conclusively negated the element of reliance that was essential to the Swansons' fraudulent inducement claim. *See id.* at 179–80. The court acknowledged a release will not always negate a fraudulent inducement claim. The contract and the circumstances surrounding its formation determine whether a disclaimer of reliance is binding. *See id.* at 179.

A significant fact in *Schlumberger* is the disclaimer went to the heart of the dispute they were settling. The dispute involved the viability of the diamond mining project. The Swansons disclaimed that they were relying on any representations of Schlumberger. To support their fraudulent inducement claim, the Swansons had to argue that in fact they were relying on representations of Schlumberger.

Pursuant to the settlement agreement, the Fantina leases were amended to increase the Fantina Unit lessors' royalty to a fifteen percent market value royalty. The Lessors who were also lessors in the Fantina Unit now contend they were fraudulently induced with promises that they would receive a royalty on both the Fantina Unit and the Yzaguirre Unit based on the higher GPA price. Because the settlement agreement contained a royalty increase, we conclude Lessors' disclaimer is effective to preclude their fraudulent inducement claim. Accordingly, we hold the disclaimer clause in the settlement agreement negates Lessors' claim for fraudulent inducement as a matter of law and the trial court properly granted summary judgment in favor of KCS on the fraud counterclaim.

The supreme court has made clear its holding in *Formosa* is limited to a claim of fraudulent inducement. *See D.S.A., Inc. v. Hillsboro Indep. Sch. Dist.*, 973 S.W.2d 662, 663 (Tex.1998). For this reasons, we must review Lessors' remaining counterclaims for negligent misrepresentation and conspiracy separately.

■■■■■ A party may only maintain a tort action, other than fraudulent inducement, in addition to a breach of contract action if the tort action is independent of the contract action. *See Southwestern Bell Telephone Co. v. DeLanney*, 809 S.W.2d 493, 494 (Tex.1991). In determining whether an independent tort exists, courts look to the nature of the damages. *See id.* Where the injury is an economic loss to the subject matter of the contract, that loss sounds in contract, not in tort. *See id.*

■■■■ Here, Lessors claim their injury is the loss of the higher proceeds royalty. This claimed injury is an economic loss to the subject matter of the leases and division orders. Because Lessors' remaining counterclaims do not represent independent torts, we conclude the trial court properly granted partial summary judgment on the counterclaims of negligent misrepresentation, gross negligence, and conspiracy in favor of KCS. *See id.* at 494–95; *Robles v. Consolidated Graphics, Inc.*, 965 S.W.2d 552, 559–60 (Tex.App.—Houston [14th Dist.] 1997, pet. denied). We overrule Lessors' third issue on the counterclaims.

EXCLUDED TESTIMONY ON MARKET VALUE

■■■■ In their fourth issue, Lessors contend the trial court erred in refusing to allow Lessors' expert to testify on the issue of market value. After the trial court granted the various summary judgments on the interpretation of the leases, application of the division orders and viability of Lessors' counterclaims, all that remained for trial was calculation of the actual amount of market value. The parties' dispute concerning the calculation of market value was whether to consider the GPA price. We review a trial court's decision on the admission of evidence under an abuse of discretion standard. *See United Blood Svcs. v. Longoria*, 938 S.W.2d 29, 30 (Tex.1997).

The parties filed a joint motion under Texas Rule of Civil Procedure 166 asking the trial court to determine whether the testimony of Lessors' expert, Tom Johnson, would be admissible at trial. In that motion, Lessors stated Johnson would testify that "the market value at the well for gas produced and sold from the [Yzaguirre Unit] is the actual price received for such gas under the [GPA]." Further, they stated his testimony was based solely on the GPA price and not on an analysis of comparable sales.

■■■■ The supreme court has defined market value to be the price property

would bring when it is offered for sale by one who desires, but is not obligated to sell, and bought by one who is under no obligation of buying it. *See Middleton,* 613 S.W.2d at 246. Market value is calculated by using comparable sales. *See id.* Comparable sales are sales comparable in time, quality, quantity, and availability of marketing outlets. *See id.* Where gas is being sold at a set price pursuant to a gas purchase agreement, that contract price has no bearing on the current market value. *See Texas Oil & Gas Corp. v. Vela,* 429 S.W.2d 866, 870–71 (Tex.1968).

■ The expert testimony Lessors sought to admit on market value was contrary to the supreme court's definition of market value. In the joint rule 166 motion for ruling, Lessors' admitted that Johnson only looked at the GPA price and not at comparable sales. For this reason, we conclude the trial court did not abuse its discretion in ruling the expert testimony of Johnson was not admissible at trial. We overrule Lessors' fourth issue.

### FAILURE TO TRANSFER VENUE OR ABATE

In their fifth issue, Lessors contend the trial court erred in denying their motion to transfer venue. In their sixth issue, Lessors contend the trial court erred in refusing to abate the lawsuit in favor of the one in Zapata County.

#### 1. Venue

■ Coastal and Tesoro filed the initial lawsuit in Dallas County because one of the Lessors had its principal office in Dallas. *See* TEX.CIV.PRAC. & REM.CODE ANN. § 15.002(a)(3) (Vernon Supp.2000). KCS intervened in the lawsuit on behalf of its interests in both the Fantina Unit and the Yzaguirre Unit. Lessors filed their motion to transfer venue and it was determined by the trial court before Lessors requested severance. Lessors rely on two

statutes to support their contention that venue was mandatory in Zapata County. Lessors first rely on section 15.011 of the Texas Civil Practice and Remedies Code. At the time the joint Lessees filed this lawsuit, section 15.011 provided:

> Actions for recovery of real property or an estate or interest in real property, for partition of real property, to remove encumbrances from the title to real property, or to quiet title to real property shall be brought in the county in which all or a part of the property is located.

Act of May 17, 1985, 69th Leg., R.S., ch. 959, § 1, 1985 Tex.Gen.Laws 3242, 3247 (amended 1995) (current version at TEX. CIV.PRAC. & REM.CODE ANN. § 15.011 (Vernon Supp.2000)). Under this section, the mandatory venue provision applies only when title to real property is at issue in the lawsuit. *See Maranatha Temple, Inc. v. Enterprise Products Co.,* 833 S.W.2d 736, 738 (Tex.App.—Houston [1st Dist.] 1992, writ denied). To determine whether a lawsuit involves title, a court looks at the facts alleged in plaintiff's petition and the relief sought. *See id.*

■ In its original petition, KCS sought a declaration that the royalties are to be computed on the basis of current market value. KCS did not question the amount of land Lessors owned or the percentage interest each Lessor owned in the leases. KCS did not contest any of the Lessors' rights to a royalty interest. Because KCS only sought a declaration of the amount of the royalty and did not contest Lessors' right to a royalty, title was not an issue in this lawsuit. Because title was not involved, the mandatory venue provision of section 15.011 does not apply.

■ Secondly, Lessors rely on provisions of the Texas Natural Resources Code to support their contention that mandatory

venue was in Zapata County. Section 91.404(c) provides as follows:

(c) A payee has a cause of action for nonpayment of oil or gas proceeds or interest on those proceeds as required in Section 91.402 or 91.403 of this code in any court of competent jurisdiction in the county in which the oil or gas well is located.

TEX.NAT.RES.CODE ANN. § 91.404(c) (Vernon 1993).

We decline Lessors' invitation to construe section 91.404(c) to control *all* royalty suits. By its own terms, the mandatory venue provision of section 91.404(c) is limited to lawsuits brought by Lessors to obtain royalty payments. This section does not prohibit a lessee from bringing a declaratory judgment action to determine the computation of royalties in a county other than where the oil or gas well is located. We overrule Lessors' fifth issue.

### 2. Abatement

Lessors also contend the trial court erred in denying their motion to abate. Coastal and Tesoro filed suit in Dallas County on November 23, 1994. KCS filed its plea in intervention and original petition on December 1, 1994. On December 12, 1994, Lessors filed a lawsuit in Zapata County also seeking an interpretation of the leases. Lessors filed a plea in abatement, along with its motion to transfer, requesting the trial court to abate the Dallas County action. The trial court denied Lessors' motion. The plea in abatement was filed and decided by the trial court prior to the severance of the case.

When a lawsuit is proper in more than one county, the court in which the lawsuit is first filed acquires dominant jurisdiction to the exclusion of the other courts. *See Curtis v. Gibbs,* 511 S.W.2d 263, 267 (Tex.1974). "When an inherent interrelation of the subject matter exists in two pending lawsuits, a plea in abatement in the *second* action must be granted." *See Wyatt v. Shaw Plumbing Co.,* 760 S.W.2d 245, 247 (Tex.1988) (emphasis added).

We previously concluded the trial court did not err by maintaining venue in Dallas County. Because KCS filed its lawsuit first in Dallas County, the court in Dallas County acquired dominant jurisdiction over the subject matter of the lawsuit. *See Curtis,* 511 S.W.2d at 267. The Dallas County and Zapata County lawsuits involve the same subject matter. For this reason, abatement of the Dallas County lawsuit would have been improper. *See Wyatt,* 760 S.W.2d at 247. We overrule Lessors' sixth issue.

We overrule all of Lessors' issues and affirm the trial court's judgment.