**IFC CREDIT CORPORATION,**
Appellant

v.

**SPECIALTY OPTICAL SYSTEMS,**
**INC., Appellee.**

No. 05–06–01082–CV.

Court of Appeals of Texas,
Dallas.

April 24, 2008.

David R. Weiner, Kelly Dean Hollingsworth, Glast Phillipsm& Murray PC, Dallas TX, Debra R. Devassy, D. Alexander Darcy, Askounis & Borst, P.C., Chicago IL, for Appellant.

Steven J. Lownds, Marcie L. Schout, Quilling, Selander, Cummiski & Lownds, P.C., Dallas TX, for Appellee.

Before Justices RICHTER, FRANCIS, and LANG–MIERS.

## OPINION

Opinion by Justice RICHTER.

This case involves the enforceability of a lease under the Uniform Commercial Code ("UCC"). Appellant IFC Credit Corporation ("IFC") is the assignee of a lease between Appellee Specialty Optical Systems ("Specialty") and NorVergence, Inc. ("NorVergence"). After a three-day bench trial, the court found the lease was unenforceable, entered judgment for Specialty, and awarded sanctions against IFC. IFC challenges the trial court's judgment in

eight issues, arguing: (1) the trial court erred in finding the lease was not a finance lease; (2) there is no evidence to support the finding that IFC was not a holder in due course at the time of the assignment; (3) there is no evidence to support the court's fraudulent inducement finding; (4) there is no evidence to support the court's finding that the lease failed for lack of consideration; (5) the trial court erred in finding the lease and delivery and acceptance certificate were unconscionable; (6) the trial court erred when it found the lease's accelerated damages provision was an unenforceable penalty; (7) no evidence supports the trial court's finding that IFC failed to mitigate damages; and (8) the trial court erred when it ruled against IFC on its breach of contract counterclaim. In a ninth issue, IFC maintains the trial court abused its discretion when it awarded sanctions against IFC. We ·conclude the trial court did not err when it found the lease was unenforceable because Specialty was fraudulently induced to enter into the lease. We also conclude the sanctions award constituted an abuse of discretion. We affirm the trial court's judgment and vacate the sanctions order.

## I. BACKGROUND

IFC is a leasing company engaged in the business of leasing equipment and purchasing existing leases. NorVergence, an entity that is now bankrupt, was a reseller of telecommunications services from common carriers. The services were marketed at a discount to small and medium-sized companies. NorVergence's customers were required to lease a "Matrix Box" (the "Box"), equipment that NorVergence represented enabled it to supply low-cost telecommunications services.

IFC began to purchase leases from NorVergence in October 2003. The terms of purchase were memorialized in a master program agreement. The initial agreement required IFC to make full payment for the leases it purchased and afforded IFC no protection if NorVergence filed bankruptcy.

In January 2004, about the same time IFC was scheduled to start receiving payments from the first group of leases it purchased from NorVergence, IFC began to receive letters and telephone calls from unhappy NorVergence customers from whom it expected lease payments. The customers complained they were getting billed, but not receiving telecommunication services or the promised savings. IFC continued to receive these calls from disgruntled customers through May 2004.

In March 2004, NorVergence and IFC amended the master agreement (the "First Amendment"). The First Amendment provided IFC with greater financial protections, including provisions concerning the potential insolvency of NorVergence and a "holdback" provision which allowed IFC to withhold 25 percent of the amount it paid for the leases pending the lessees' performance. When customers refused to pay because they were not receiving the promised telecommunications services, IFC was not obligated to pay the amounts withheld.

In April 2004, a NorVergence representative called on Specialty to sell telecommunications services. When Specialty told NorVergence it had just signed a two-year telephone service contract with Logix, NorVergence represented it could "get Specialty out of" the contract with Logix. Specialty agreed to switch to NorVergence if the Logix contract could be cancelled. NorVergence told Specialty it was required to sign an Equipment Rental Agreement (the "Lease") to facilitate the application process, but assured Specialty it would not countersign the Lease and Specialty would not be obligated unless the Logix contract could be cancelled. On April 29, 2004, Specialty signed the Lease

and other paperwork NorVergence requested in conjunction with the application process. The Lease, printed on NorVergence's standard form, provided for sixty monthly payments of $543.67 plus tax for the rental of the Box, and expressly stated it would not be effective until countersigned by NorVergence. Service was not to be provided under the Lease for at least sixty days. Because the Box had no value other than to enable the delivery of telecommunications services, Specialty believed the monthly payment included the Box as well as all telephone service and internet access.

The Lease was a form contract that included provisions restricting the rights and remedies of the lessee. One of these provisions was a "waiver of defenses clause" which provided that any claims, defenses, or set-offs Specialty might have against NorVergence would not be asserted against a party subsequently acquiring the Lease by purchase, transfer or assignment. The Lease also contained a "hell or high water" clause.[1] Under the terms of the Lease, even if Specialty never received the services it believed it was purchasing, as long as the Box was delivered in outwardly good condition, Specialty was required to pay the monthly rental for a period of sixty months.

On May 12, 2004, NorVergence had Specialty sign a letter authorizing NorVergence to negotiate with Logix. The Box was delivered the same day. Because the service connection had yet to be provided, Specialty was unable to test the functionality of the Box and could only visually inspect the exterior of the Box. Upon delivery, Specialty signed a delivery and acceptance certificate confirming receipt of the equipment described in the Lease.

IFC continued to receive a steady stream of customer complaints about NorVergence and experienced a high rate of default on NorVergence leases. Consequently, by late April or early May 2004, IFC planned to inform NorVergence that it would not purchase any new leases. But IFC changed its mind after NorVergence agreed to provide even greater financial incentives. To this end, NorVergence and IFC amended the master agreement again (the "Second Amendment"). The Second Amendment allowed IFC to acquire leases at a discounted rate and provided for holdbacks of approximately fifty percent. The Second Amendment also excused IFC from funding the balance of the purchase price of a lease unless NorVergence provided an acceptable level of service.

On May 18, 2004, NorVergence countersigned the Specialty lease. On the same day, an IFC representative contacted Specialty to confirm the Box had been received and Specialty had signed the delivery and acceptance certificate. Working from a prepared script IFC refers to as the "verbal audit," the representative stated that IFC worked in conjunction with NorVergence, and assured Specialty it would receive the savings NorVergence had promised. After confirming that Specialty had accepted the Box and would begin making payments in sixty days, IFC took assignment of the Lease.

Specialty never received telecommunication services, nor was the Logix contract cancelled. At some point prior to June 30, 2004, NorVergence defaulted on its obligations to the common carriers with which it contracted to provide telecommunications services to lessees. On June 30, 2004, NorVergence was forced

---

1. Article 2A of the Uniform Commercial Code defines a "hell or high water" clause as a term in a finance lease making the lessee's promises under the lease contract irrevocable and independent upon the lessee's acceptance of the goods. *See* TEX. BUS. & COM.CODE ANN. § 2A.407(a) (Vernon 1994).

into an involuntary bankruptcy. Specialty notified NorVergence the Lease would be cancelled unless service was received. Service was not provided, so Specialty returned the Box to IFC. When IFC demanded the monthly lease payments, Specialty initiated this lawsuit to have the Lease declared unenforceable. IFC counterclaimed, seeking a declaratory judgment and damages for breach of contract. After a three day bench trial, the trial court entered findings of fact and conclusions of law, declared the Lease unenforceable and void ab initio, and ordered that IFC take nothing on its counterclaim. Final judgment was entered for Specialty. The trial court made findings of fact and conclusions of law. After the final judgment was entered, the trial court also entered an order awarding sanctions against IFC. This appeal followed.

## II. STANDARD OF REVIEW

■ Findings of fact in a nonjury trial have the same force and dignity as a jury's verdict. *Catalina v. Blasdel,* 881 S.W.2d 295, 297 (Tex.1994). We do not substitute our judgment for that of the factfinder even if we would have reached a different conclusion when reviewing the evidence. *FDIC v. F & A Equip. Leasing,* 854 S.W.2d 681, 684 (Tex.App.-Dallas 1993, no writ).

■ Some of the findings IFC challenges involve issues on which IFC had the burden of proof. Others involve findings on which Specialty had the burden of proof. When a party who did not have the burden of proof challenges the legal sufficiency of an adverse finding, we view the evidence in a light most favorable to the finding, consider only the evidence and inferences that support the finding, and disregard all inferences to the contrary. *Catalina,* 881 S.W.2d at 297. When a party with the burden of proof challenges the legal sufficiency of an adverse finding, he must demonstrate on appeal that the

evidence establishes, as a matter of law, all vital facts in support of the issue. *Long v. Long,* 196 S.W.3d 460, 466 (Tex.App.-Dallas 2006, no pet.). In reviewing a "matter of law" challenge, we must first examine the record for evidence that supports the finding and then examine the entire record to determine if the contrary proposition is established as a matter of law. *Dow Chem. Co. v. Francis,* 46 S.W.3d 237, 241 (Tex.2001). The issue should be sustained only if the contrary proposition is conclusively established. *Id.*

## III. DISCUSSION

*Holder in Due Course*

■ Because a number of issues depend on whether IFC was entitled to status similar to that of a holder in due course, we begin our inquiry here. In its second issue, IFC argues there is no evidence to support the trial court's finding that IFC was not a holder in due course because it took assignment of the Lease for value, in good faith, and without notice of any claims or defenses. Specialty maintains IFC failed to establish it was a holder in due course.

We note at the outset that our analysis does not involve holder in due course status per se because the holder in due course doctrine applies to negotiable instruments. *See* TEX. BUS. & COM.CODE ANN. § 3–305 (Vernon Supp.2007); TEX. BUS. & COM.CODE ANN. § 3–306 (Vernon 2002). Here, IFC contends it is entitled to rely on a waiver of defense clause in the Lease pursuant to a section of the UCC applicable to the assignee of an agreement with an account debtor. *See* TEX. BUS. & COM. CODE ANN. § 9–403 (Vernon 2002). The provision affords protection similar to that afforded a holder in due course to an assignee who meets certain holder in due course criteria. The UCC provision upon

which IFC relies provides in pertinent part:

> Except as otherwise provided in this section, an agreement between an account debtor and an assignor not to assert against an assignee any claim or defense that the account debtor may have against the assignor is enforceable by an assignee that takes an assignment:
>
> (1) for value;
>
> (2) in good faith;
>
> (3) without notice of a claim of a property or possessory right to the property assigned; and
>
> (4) without notice of a defense or claim in recoupment of the type that may be asserted against a holder in due course of a negotiable instrument under Section 3.305(b).

*Id.* Comment 3 to Section 9.403 states: "[T]his section is designed to put the assignee in a position that is no better and no worse than that of a holder in due course of a negotiable instrument under Article 3." TEX. BUS. & COM.CODE ANN. § 9.403, Comment 3 (Vernon 2002). Consequently, cases involving a holder in due course under Article 3 are instructive to our analysis.

 The protections bestowed on those who qualify for holder in due course status are intended to safeguard innocent holders who acquire a note without prior knowledge of any problems or defenses. *See* TEX. BUS. & COM.CODE ANN. § 3.302 (Vernon 2002). In the context of negotiable instruments, a holder in due course takes an instrument free of all claims to the instrument and of all defenses of any party to the instrument with whom the holder has not dealt. *See Agar v. Regency Sav. Bank,* 914 S.W.2d 725, 727 (Tex.App.-Beaumont 1996, no writ). A holder is presumed to be a holder in due course unless there is evidence to the contrary. *Williams v. Stansbury,* 649 S.W.2d 293,

295 (Tex.1983). However, the presumption may be overcome by negating the elements requisite to holder in due course status. *See Favors v. Yaffe,* 605 S.W.2d 342, 344 (Tex.Civ.App.-Houston [14th Dist.] 1980, writ ref'd n.r.e.). Once the presumption is overcome, the person claiming the rights of a holder in due course has the burden to establish his status as such. *See Jones v. Missouri Sav. Ass'n,* 756 S.W.2d 423, 424 (Tex.App.-Dallas 1988, no writ).

 "Good faith" is defined in Section 1.201(20) of the Texas Business and Commerce Code as "honesty in fact and the observance of reasonable commercial standards of fair dealing." TEX. BUS. & COM. CODE ANN. § 1.201(20) (Vernon Supp.2007). The test for good faith is whether the purchaser had actual knowledge of facts and circumstances amounting to bad faith. *Jones v. Missouri Sav. Ass'n,* 756 S.W.2d at 424. A person has "notice of a fact" when: (1) he has actual knowledge of it; (2) he has received a notice or notification of it; or (3) from all the facts and circumstances known to him at the time in question, he has reason to know it exists. *See* TEX. BUS. & COM.CODE ANN. § 1.202(a) (Vernon Supp.2007). It has been observed that "[t]he basic philosophy of the holder in due course status is to encourage free negotiability of commercial paper by removing certain anxieties of one who takes the paper as an innocent purchaser knowing no reason why the paper is not as sound as its face would indicate." *First Nat. Acceptance Co. v. Bishop,* 187 S.W.3d 710, 715 (Tex.App.-Corpus Christi 2006, no pet.) (*citing Unico v. Owen,* 50 N.J. 101, 232 A.2d 405, 410 (1967)). Therefore, the more the holder knows about the underlying transaction and controls or participates in it, "the less need there is for giving him the tension-free rights considered neces-

sary in a fast-moving, credit-extending commercial world." *Id.*

Application of these principles to the circumstances of the present case demonstrates beyond peradventure that IFC was not entitled to the protections of a holder in due course because it did not take assignment of the Lease in good faith and without notice of a defense. Although the leases referenced only the Box, IFC knew NorVergence was marketing the leases by promising services and savings in conjunction with the Box. IFC was also aware that in the absence of T–1 service or telephone service, the Box was not functional and had no value. IFC approved the lease forms used by NorVergence, and would not have purchased the leases if they had not been structured as standard equipment leases. Although IFC was entitled to require transactional documents affording the commercial advantages and protections of the UCC, its level of participation in the underlying transaction precludes its claimed status as an ordinary purchaser of commercial paper.

IFC knew that NorVergence was not providing the promised service to some of its customers, and at one point decided not to purchase any more leases. By the time Specialty signed the Lease, IFC had been receiving letters and telephone calls for months about NorVergence's failure to provide service. The lack of service resulted in a high rate of default. IFC was not only aware of the difficulties with the NorVergence leases, but was sufficiently concerned about NorVergence's deteriorating financial condition that it amended the master program agreement twice. Each amendment provided an enhanced level of protection for IFC and each was fortuitously timed. The First Amendment absolved IFC from its obligation to pay holdbacks to NorVergence when customers refused to make payments under the leases. The Second Amendment, which provided IFC with protection if IFC became bankrupt, was negotiated only weeks before bankruptcy actually occurred.

Despite its awareness that customers were not receiving the promised services, IFC worked with NorVergence to reassure new customers that services were forthcoming by conducting the verbal audit. Before taking on the Specialty lease, an IFC representative contacted Specialty to conduct the verbal audit. IFC proceeded with the assignment only after confirming the Box had been received and Specialty had signed the delivery and acceptance certificate. The delivery and acceptance of the Box triggered the "hell or high water clause," rendering the Lease irrevocable. All defenses were waived and all warranties disclaimed. Because of the way the transaction was structured, Specialty was obligated to make monthly payments under the Lease regardless of whether service was ever received. IFC's timing of the Lease assignment until it was assured the protections afforded by the documents had been locked into place, coupled with its awareness of the difficulties with the leases, move the transaction beyond the realm of innocent acquisition of commercial paper.

The trial court found that in the April and May 2004 time frame, IFC had knowledge of the fact that NorVergence was promising savings with no intent to deliver. Although the testimony is unclear as to whether NorVergence had defaulted on its obligations to telecommunications carriers by May 18, 2004, IFC admitted such a default would have rendered NorVergence incapable of providing the services it promised to Specialty. The trial court also found IFC was aware of NorVergence's fraud at the time of the Specialty lease, and IFC participated in deceiving customers through the confirmation script it jointly prepared with NorVergence for use

in the verbal audit. We need not determine whether IFC actually participated in the fraud, but conclude from all of the facts and circumstances the evidence was sufficient to establish IFC had notice and did not take assignment of the Lease in good faith. Accordingly, the trial court did not err when it found IFC was not entitled to the protections of a holder in due course.

*The Waiver of Defense Clause*

■ IFC contends the waiver of defense clause in the Lease shields it from Specialty's fraudulent inducement and failure of consideration claims. The waiver of defense clause provides:

> We may sell, assign or transfer all or any part of this rental and/or the equipment without notifying you. The new owner will have the same rights that we have, but not our obligations. You agree that you will not assert against the new owner any claims, defenses or set-offs that you may have against us.

To invoke the protection of a waiver of defense clause, IFC was first required to establish that it had status akin to that of a holder in due course. *See* Tex. Bus. & Com.Code Ann. § 9.403 (Vernon 2002). We have concluded IFC was not entitled to holder in due course protection. Therefore, IFC was not entitled to invoke the waiver of defense clause, and Specialty was entitled to raise its fraudulent inducement and failure of consideration defenses.

*Fraudulent Inducement*

■ The trial court found the Lease was unenforceable because NorVergence's false promises concerning termination of the Logix contract fraudulently induced Specialty to sign the Lease. In its third issue, IFC asserts there was no evidence to support the trial court's finding. We disagree.

IFC first argues the no-reliance clause in the delivery and acceptance certificate precludes Specialty's fraudulent induce-

ment defense. In support of its contention, IFC cites *Schlumberger Tech. Corp. v. Swanson,* 959 S.W.2d 171 (Tex.1997). In *Schlumberger,* the Texas Supreme Court held that a disclaimer of reliance provision negated the element of reliance required for a fraudulent inducement claim. But the court acknowledged that a release will not always negate a fraudulent inducement claim. In fact, the court was careful to point out that its holding was specifically based on the facts "on this record." *Id.* at 181. The court held that the contract and the circumstances surrounding its formation determine whether a disclaimer of reliance is binding. *See id.* at 179; *see also, Yzaguirre v. KCS Resources, Inc.,* 47 S.W.3d 532, 542 (Tex. App.-Dallas 2000), *aff'd,* 53 S.W.3d 368 (Tex.2001). Factors to consider include: (1) the terms of the contract; (2) the circumstances surrounding formation; (3) whether the parties are represented by counsel; and (4) whether the parties negotiated at arm's length. *Schlumberger* at 179–80. Therefore, when assessing the effect of the no-reliance clause at issue in this case, we must analyze not only the provision itself, but the circumstances under which the delivery and acceptance clause was executed.

The no-reliance provision provides:

> The undersigned certifies that it has received and accepted all the equipment described in the Equipment Rental Agreement ... **There are no side agreements or cancellation clauses given outside the Equipment Rental Agreement.**
>
> I have reviewed and I understand all of the terms and conditions of the Equipment Rental Agreement. **I AGREE THAT THE RENTAL PAYMENT ... WILL BEGIN 60 DAYS FROM THE DATE OF THIS DELIVERY AND ACCEPTANCE CERTIFICATE ...** I was not induced to sign this by any

assurance of the Rentor or anyone else. I have had a reasonable opportunity to inspect the goods.

Although the delivery and acceptance certificate references the Lease, it is not clear that the disclaimer of inducement pertains to the Lease rather than the delivery and acceptance certificate itself. In the phrase "I was not induced to sign this" the antecedent of "this" appears to be the delivery and acceptance certificate, not the Lease. But even if the contractual language is sufficient to preclude reliance, the circumstances under which the delivery and acceptance certificate was signed distinguish this case from *Schlumberger*. Here, there was no negotiation at all—the delivery and acceptance certificate is composed of boilerplate language referencing a form contract. Unlike *Schlumberger*, where the parties were attempting to resolve a dispute by specifically negotiating and executing a release, the language here is not necessarily specific as to the misrepresentations made by NorVergence. Specialty was not represented by counsel, and believed it was only signing to acknowledge that it had received the Box. We conclude the circumstances are such that the no-reliance language in the delivery and acceptance certificate does not preclude Specialty's claim that it was fraudulently induced to enter into the Lease.

■■■ IFC also maintains Specialty failed to establish the element of intent because Specialty did not offer any evidence to show NorVergence intended to deceive Specialty when it made promises concerning services and the termination of the Logix contract. IFC also argues there is no evidence of whether NorVergence believed it had financing to continue its operations when it signed the Lease. IFC's argument is misplaced. Proof of intent to deceive is almost always made by circumstantial evidence. *See Chase Commercial Corp. v. Datapoint Corp.*, 774

S.W.2d 359, 367 (Tex.App.-Dallas 1989, no writ). Although the failure to perform a contract is not evidence of fraudulent intent per se, circumstantial evidence, when coupled with proof of nonperformance, is sufficient to support a finding of fraudulent intent. *See Spoljaric v. Percival Tours, Inc.*, 708 S.W.2d 432, 435 (Tex.1986).

When NorVergence approached Specialty about the Lease, it had already failed to provide the promised services to numerous lessees. Service was never provided to Specialty. Specialty testified it would never have signed the Lease if NorVergence had not promised the Lease would not be countersigned and effective unless the Logix contract was cancelled. Although Specialty signed the Lease on April 29, NorVergence did not provide Specialty with the form to authorize negotiation with Logix until May 12—the very same day the Box was delivered. The Lease was already in the process of being assigned to IFC. Given the simultaneous occurrence of the delivery of the Box and the form authorizing the Logix negotiation, it is reasonable to infer NorVergence did not intend to pursue negotiation with Logix. Because the assignment was already in progress, it is also reasonable to infer NorVergence did not intend to treat the Lease as nonbinding unless the Logix contract was cancelled. Therefore, there was more than a scintilla of evidence of intent to defraud.

■■■ IFC also complains that Specialty could not establish NorVergence's oral promises through parol evidence. It is well-established, however, that fraud may be established by the introduction of extrinsic evidence. *See DRC Parts & Accessories, L.L.C. v. VM Motori, S.P.A.*, 112 S.W.3d 854, 864 (Tex.App.-Houston [14th Dist.] 2003, pet. denied). Thus, the parol evidence rule does not prevent the use of oral testimony to establish fraud. *See*

*DRC Parts & Access., L.L.C. v. VM Motori, S.P.A.*, 112 S.W.3d 854, 864 (Tex.App.-Houston [14th Dist.] 2003, pet. denied).

We conclude the evidence was sufficient to support the trial court's finding that the Lease was unenforceable because Specialty was fraudulently induced to sign it. IFC's third issue is resolved against it. Because of our resolution of this issue, we need not reach IFC's remaining issues concerning the judgment.

*Sanctions*

 Specialty moved for summary judgment prior to trial. IFC filed a response supported by the affidavit of executive vice-president Patrick Witowski. The affidavit stated that IFC took assignment of the Lease by paying the purchase price of $24,723.51, the amount of damages to which IFC claimed it was entitled to recover on its counterclaim for breach of contract. When it was subsequently disclosed that IFC paid only $11,743.67 of the full purchase price for the Lease, Specialty filed a motion for sanctions. The motion requested that IFC be sanctioned because Witowski's affidavit constituted perjury.

Following the entry of final judgment, the court conducted a hearing on the motion for sanctions. Witowski testified that the $13,000 discrepancy between the contractual purchase price and the amount paid resulted from two holdbacks in the amount of $6, 180.88 and one for $618.09. Witowski explained that the accounting for the holdbacks was complicated, and the court agreed. Although the holdbacks were never paid to NorVergence because it never met the conditions triggering payment, IFC claims the holdbacks were effectively credited to NorVergence because the total amount of NorVergence's recourse obligations to IFC for its breach far exceeded the amount of its holdbacks. Witowski testified that the statement he made in his affidavit was not false.

At the conclusion of the hearing, the trial court entered an order sanctioning IFC. The order requires IFC to send letters to all lessees against which it has made claims under leases or rental agreements acquired from NorVergence. The letter must explain the precise amount of money paid to NorVergence, the basis for and amount of any holdbacks, the basis for the holdback, and the manner in which the holdbacks were applied in IFC's accounting records. Although IFC is in litigation with many of the lessees, none are a party to this case. IFC is also ordered to provide copies of the letters to counsel for Specialty and to pay counsel for Specialty the sum of $13,600 as reimbursement for the fees to be incurred monitoring IFC's compliance. The order also awards $22,078.25 to Specialty for attorney's fees incurred in bringing the motion, and the sum of $803.92, representing two times the actual costs incurred by Specialty. In its ninth issue, IFC argues the imposition of sanctions constitutes an abuse of discretion because: (1) the entry of the award violates IFC's fundamental right of due process because IFC was not given notice that the holdbacks would constitute a basis for sanctions in the absence of a finding that IFC committed perjury; (2) it is improper to sanction IFC on the basis that it engaged in "double dipping" by attempting to collect damages from Specialty when it had not remitted the holdbacks to NorVergence;[2] (3) the sanctions were excessive;

2. This argument is premised on IFC's assumption that the sanctions were based upon what the court termed "double dipping." The sanctions order is silent as to the basis for the award, but IFC maintains the court's rationale for the sanctions can be "gleaned from the trial court's comments at the sanctions hearing." This reliance is misplaced because we cannot construe a trial court's comments as findings of fact and conclusions of law. *See Rutledge v. Staner*, 9 S.W.3d 469, 470 (Tex.App.-Tyler 1999, pet. denied).

and (4) because IFC is in litigation with most of the lessees to whom IFC is required to send notice, the imposition of non-monetary sanctions constitutes an improper attempt to control litigation in foreign courts.

■ We review a ruling on a motion for sanctions under an abuse of discretion standard. *Cire v. Cummings*, 134 S.W.3d 835, 838 (Tex.2004). "The test for an abuse of discretion review is not whether, in the opinion of the reviewing court, the facts present an appropriate case for the trial court's action, but 'whether the court acted without reference to any guiding rules and principles.'" *Cire*, 134 S.W.3d at 839 (*citing Downer v. Aquamarine Operators, Inc.*, 701 S.W.2d 238, 241-42 (Tex. 1985)). The trial judge's ruling will be reversed only if it was arbitrary or unreasonable. *Id.*

■ The motion for sanctions fails to identify the legal authority upon which the request for sanctions was premised and states only that IFC should be sanctioned due to Witowski's alleged perjury. The trial court made no findings in connection with the sanctions and the sanctions order fails to state the legal basis upon which it is made. Because the complained-of conduct centers around an affidavit filed with the court, the source of the power for the court's sanction appears to be TEX.R. CIV. P. 13 or the trial court's "inherent power" to sanction.[3] A trial court has inherent power to sanction to the extent necessary to deter, alleviate, and counteract bad faith abuse of the judicial process. *In re Bennett*, 960 S.W.2d 35, 40 (Tex.1997); *Dallas County Constable v. KingVision Pay–Per–View*, 219 S.W.3d 602, 610 (Tex.App.-Dallas 2007, no pet.). To support the entry of sanctions under a court's inherent powers, the trial judge must find that the party caused significant interference with the legitimate exercise of the traditional core functions of the court. *Eichelberger v. Eichelberger*, 582 S.W.2d 395, 398 (Tex.1979). TEX.R. CIV. P. 13 provides for sanctions if a party files a pleading that is "groundless and brought in bad faith or groundless and for the purpose of harassment." A court may not impose sanctions under Rule 13 unless it finds "good cause" to do so, and specifies the particulars in the sanctions order. *See GTE Comm'ns Sys. Corp. v. Tanner*, 856 S.W.2d 725, 731 (Tex.1993) (orig.proceeding). Failure to state good cause constitutes noncompliance with the rule and renders the order unenforceable. *See Keever v. Finlan*, 988 S.W.2d 300, 312 (Tex.App.-Dallas 1999, pet. dism'd); *Gaspard v. Beadle*, 36 S.W.3d 229, 239 (Tex.App.-Houston [1st Dist] 2001, pet. denied).

In this case, the court failed to specify good cause. Therefore, the order is invalid under TEX.R. CIV. P. 13.

■ The order is equally deficient if it was entered under the court's inherent power to sanction. Although perjury could interfere with the legitimate exercise of the court's core functions, there was neither a finding of such interference, nor a finding of perjury. In fact, the court appeared to agree that the attestation regarding the Lease purchase price was not a false statement. The court stated:

> I can see how [Witowski] could say $24,000 was spent for [the Lease] ... I honestly don't know if $24,000 was paid to NorVergence since it was held back and the conditions weren't met for them to acquire it. Its technical.

Regardless of the legal authority under which a sanction is imposed, a sanction

---

**3.** During the sanctions hearing, the court stated "[d]id they have a good faith basis in law and fact to claim it had been paid? I guess this is the question the court has to address." This inquiry could be pertinent to either a Rule 13 or an inherent powers analysis.

cannot be excessive and should not be assessed without appropriate guidelines. *See Low v. Henry,* 221 S.W.3d 609, 620 (Tex.2007) (discussing limitations on sanctions under Rule 215 and Chapter 10); *Greiner v. Jameson,* 865 S.W.2d 493, 499 (Tex.App.-Dallas 1993, writ denied) (Rule 215 requirement that sanctions be just also applies to the court's inherent power to sanction). Whether an imposition of sanctions is "just" is measured by two standards. *See TransAmerican Nat. Gas Corp. v. Powell,* 811 S.W.2d 913, 917 (Tex. 1991) (sanctions under Rule 215). First, the sanctions the court imposes must relate directly to the abuse found. Second, just sanctions must not be excessive. *Id.* The absence of an explanation as to how the trial court determined both the monetary and the non-monetary sanctions is inadequate. The court awarded $22,078.25 in attorney's fees for the motion when the entire amount of attorney's fees for the trial of the matter were only $45,000.[4] The amount of costs incurred, as established by affidavit, were $401.96, and the court gives no explanation or authority for doubling these costs. The record is also silent as to the court's rationale for requiring IFC to contact other lessees in other litigation or for the court's appointment of Specialty's counsel to police the notification process. Without guidance from the court as to the nature of the offensive conduct, we are unable to determine a relationship between the sanction, the conduct, and the abuse sought to be remedied. Accordingly, we conclude the trial court abused its discretion when it awarded sanctions against IFC. We sustain IFC's ninth issue.

### III. CONCLUSION

Having resolved all of IFC's issues concerning the judgment against it, we affirm the trial court's judgment. We sustain IFC's issue concerning the award of sanctions, and vacate the trial court's order on sanctions.

---

4. Attorney's fees were presented to the court by affidavit, and the reasonableness and necessity of such fees were also challenged by affidavit.