**Amy DAVIS, Appellant,**

v.

**Ann Caldwell RUPE, as Trustee for the Dallas Gordon Rupe, III 1995 Family Trust, Appellee.**

No. 05–08–00813–CV.

Court of Appeals of Texas, Dallas.

March 8, 2010.

Rehearing Overruled April 20, 2010.

Robert B. Gilbreath, Hawkins, Parnell & Thackston, LLP, Hilaree A. Casada, Katherine Khristine Elrich, Hermes Sargent Bates, L.L.P., Dallas, for appellant.

Charla G. Aldous, Aldous Law Firm, Steven E. Aldous, Robert R. Varner, Jr., Braden, Varner & Aldous, P.C., R. Brent Cooper, Cooper & Scully, P.C., Dallas, for appellee.

Before Justices MORRIS, BRIDGES, and FITZGERALD.

## OPINION

Opinion by Justice MORRIS.

This appeal challenges an order imposing sanctions on an attorney. Amy Davis contends the evidence is insufficient to support the trial court's conclusion that she engaged in sanctionable conduct. Davis argues the record conclusively negates each allegation against her and the trial court abused its discretion in ordering her to pay sanctions. After reviewing the record, we conclude there is evidence to support the trial court's decision.

The order at issue addresses Davis's representation of the defendants in the cause below. Appellee Ann Caldwell Rupe sued the defendants, claiming she was oppressed as a minority shareholder of a closely held, family-owned investment corporation. Rupe asserted claims for accounting and valuation, breach of fiduciary duty, and shareholder oppression.

During the course of the proceedings, Rupe filed three motions for sanctions against Davis based on her actions as the defendants' attorney. The third motion, filed after the final judgment was signed, alleged that Davis made various misrepresentations demonstrating a lack of candor with the court. In the order granting the motion, the trial court stated that Davis "made multiple misleading statements and misrepresentations." The court further found that there was "a continuing pattern by Ms. Davis to misstate the facts, avoid direct questions, and engage in a total lack of candor with the Court." The court concluded that Davis's "continuing course of conduct" was sanctionable. The court ordered Davis to pay $15,000 to Rupe's counsel and participate in ten hours of ethics training. In doing so, the court stated that, although it was imposing "lesser sanctions," the sanctions chosen would "in all likelihood . . . deter repetition of the conduct by Ms. Davis, and deter repetition of the sanctionable conduct by other lawyers."

A trial court's ruling on a motion for sanctions is reviewed under an abuse of discretion standard. *Cire v. Cummings*, 134 S.W.3d 835, 838 (Tex.2004). In our review, we do not opine on whether the facts presented an appropriate case for the trial court's action. *Id.* at 838–39. Rather, we determine only whether the court acted without reference to any guiding rules or principles. *Id.* We review the evidence in the light most favorable to the trial court's ruling and draw all reasonable inferences from the evidence to sustain the judgment. *See Kutch v. Del Mar Coll.*, 831 S.W.2d 506, 512 (Tex.App.-Corpus Christi 1992, no writ). The trial court, as the finder of fact, has the right and the duty to weigh the evidence presented and make reasonable deductions therefrom. *See Hlavinka v. Griffin*, 721 S.W.2d 521, 524 (Tex.App.-Corpus Christi 1986, no writ).

An order of sanctions by the trial court involves two separate decisions. The

first decision is whether to impose a sanction. *See Ford Motor Co. v. Tyson,* 943 S.W.2d 527, 535 (Tex.App.-Dallas 1997, orig. proceeding). The second decision is what sanction to impose. *Id.* Davis's appeal challenges only the first of these two decisions.[1] Our analysis in this case, therefore, is limited to whether the trial court abused its discretion in deciding to impose sanctions. We do not address whether the types of sanctions ultimately chosen were unsupported by the evidence or whether the amount of the monetary sanction was excessive. Instead, we address the question of whether there is any evidence to support the trial court's findings that Davis made misrepresentations to the court or otherwise engaged in sanctionable conduct. In her sole issue on appeal, Davis maintains there is none.

■■■ A trial court has inherent power to discipline an attorney's behavior by imposing sanctions. *See In re Bennett,* 960 S.W.2d 35, 40 (Tex.1997). · This inherent power exists to enable courts to effectively perform their judicial functions and to protect their dignity, independence, and integrity. *See Eichelberger v. Eichelberger,* 582 S.W.2d 395, 399 (Tex.1979). The power may be exercised to the extent necessary to deter, alleviate, and counteract bad faith abuse of the judicial process, such as any significant interference with the traditional core functions of the court. *See Lawrence v. Kohl,* 853 S.W.2d 697, 700 (Tex.App.-Houston [1st Dist.] 1993, no writ). The core functions of a trial court include hearing evidence, deciding issues of fact raised by the pleadings, deciding questions of law, rendering final judgments, and enforcing judgments. *See Dallas County Constable Precinct 5 v. KingVision Pay-*

*Per-View, Ltd.,* 219 S.W.3d 602, 610 (Tex. App.-Dallas 2007, no pet.). Making misleading statements and misrepresentations to the court interferes with these core functions. *See Sims v. Fitzpatrick,* 288 S.W.3d 93, 106 (Tex.App.-Houston [1st Dist.] 2009, no pet.).

The first misrepresentation alleged in Rupe's third motion for sanctions involved discussions between Davis and several jurors after the verdict was rendered. Rupe contended that Davis misrepresented her contact with at least one juror by failing to disclose that she had questioned the juror about evidence of an alleged racial character brought out at trial. Davis's discussions with the jurors immediately preceded the defendants filing a motion for new trial. In that motion, the defendants argued that plaintiff's counsel "improperly raised the spectre of racial prejudice" by questioning one of the defendants at trial about her family's ties to the Koon Kreek Klub. At the hearing on the motion for new trial, Rupe's counsel argued that the defense lawyers had contacted all twelve jurors in an effort to obtain affidavits stating that the reference to the Koon Kreek Klub had impacted the verdict. According to Rupe's counsel, it appeared that none of the jurors was willing to sign such an affidavit. In response to this argument, Davis's co-counsel stated that they had not, in fact, sought affidavits from the jurors on the matter. The trial court asked defense counsel, "[y]ou didn't ask one juror if [the reference to the Koon Kreek Klub] played a factor?" Davis responded that she spoke with four jurors and that "[t]wo of the four mentioned sua sponte, without any—without any probing or inquiry at all, that they were very taken

---

1. Davis's appellate brief contains no argument addressing the trial court's choice of sanctions, and Davis conceded in oral argument that she was not challenging the amount of the monetary sanction or the requirement that she complete ten hours of ethics training in addition to the hours required for continuing legal education.

aback and it was very impactful, this reference [to the Koon Kreek Klub] . . . ."

Later in the hearing, the court asked again, "are you telling this Court . . . that you didn't ask a single one of [the jurors] that during the course of the trial leading up to the deliberations that that didn't play a factor . . . ?" Davis responded that she did not inquire about the content of the jury's deliberations. The court pointedly stated "[t]hat's not what I asked." After several attempts to clarify the question, Davis again stated she spoke to four jurors and that two of them raised the issue of the Koon Kreek Klub evidence without being asked. The court then said it wanted an affidavit from Davis identifying the jurors she spoke to who were surprised by the Koon Kreek Klub evidence. The court indicated that one of the reasons it wanted the affidavit was because it found it "very hard to believe that your firm did not ask these [jurors] what you spent five hundred pages on trying to get a new trial."

Approximately a week later, Davis submitted her affidavit to the trial court. The affidavit reiterated Davis's earlier statement that she interviewed four jurors after the jury was discharged and two of them mentioned, without any prompting from her, that they recalled the reference to the Koon Kreek Klub. Davis then stated, "I did not question the jurors about their mental process of analyzing, discussing, and weighing the evidence which contained reference to 'Koon Kreek Klub,' nor did I question the jurors about their mental process of analyzing, discussing, and weighing any argument made by [plaintiff's counsel] in her closing argument. Based on my understanding of the definition of 'deliberations,' I maintain that I did not question the discharged jurors regarding their deliberations."

In the motion for sanctions, Rupe contended that Davis misrepresented her contact with at least one of the jurors and attached as evidence the affidavit of Dale Perkins. Perkins was one of the four jurors with whom Davis spoke after the trial, but was not one of the two jurors who raised the issue of the alleged racist statements without being asked. According to Perkins, Davis asked her if she remembered any racial statements or words of a racial character being used by plaintiff's counsel during the trial. Perkins also stated that Davis asked her if she remembered plaintiff's counsel mentioning the words "cocoon" or "coon." Davis later conceded to the trial court that she brought up the issue of race when she spoke with Perkins. Davis argues, however, that there is nothing inconsistent between her affidavit testimony and Perkins's affidavit because she did not ask Perkins whether the alleged racially-charged language played a factor in her deliberations as a juror.

Davis's argument focuses on whether her affidavit contains any literal misstatements about what occurred in her interviews with the jurors. Even though the affidavit may be literally accurate, the trial court could have viewed Davis's affidavit as misleading. The focus of the trial court's concern, as shown by its questions and statements at the hearing, was whether Davis had directly questioned any of the jurors about the Koon Kreek Klub testimony without them raising the issue first. By narrowing her affidavit testimony to address only whether she questioned jurors about their deliberations, Davis avoided admitting she had been engaged in the broader conduct about which the court was concerned.

Davis contends that she attempted to inform the trial court about her discussions with Perkins during the hearing on the motion for new trial but the court cut her off before she could complete her answer.

The fact that Davis began to address the issue of her discussions with Perkins at the hearing indicates she was aware that this information was relevant to the trial court's concerns. Davis had the opportunity to complete her answer and reveal her discussions with Perkins in her affidavit. She chose not to do so. This is some evidence to support the trial court's finding that Davis purposefully avoided answering the court's questions.

■ Another misrepresentation alleged in Rupe's motion for sanctions was that Davis misstated the arguments presented in the defendants' motion for summary judgment. This alleged misrepresentation was made by Davis at a hearing on Rupe's request for a trial amendment. Rupe requested a trial amendment after the defendants moved for a directed verdict on the ground that they had been sued in the wrong capacity. Rupe requested leave to amend her pleadings to sue the defendants in the correct capacity.

At the hearing on Rupe's request, the defendants vigorously argued they would be unduly prejudiced by the late amendment, and Davis testified in support of this argument. She stated that the defense had pursued a strategy throughout the trial that they had been sued in the wrong capacity and a late amendment would vitiate this strategy. The trial court stated that it thought the defendants had not asserted a lack of capacity defense until thirty days before trial when they filed their first amended answer, counterclaim, and verified denial. The court indicated it was concerned the defendants had been "laying behind the log" until immediately before trial to surprise Rupe with the capacity defense. Davis responded that Rupe was put on notice of the capacity issue well before trial because the defendants' motion for summary judgment, filed three months earlier, included an argu-ment that they had not been sued in the proper capacity.

On cross-examination, Rupe's counsel asked Davis to point out exactly where in the motion for summary judgment the defendants had raised the issue of capacity. Davis first responded that a footnote in the motion stated that none of the individual defendants owned a majority interest in the corporation at issue. Davis conceded that the footnote did not specifically mention capacity but stated it was "the necessary implication of that footnote." Davis further testified that the arguments in the motion concerning whether the individual defendants owed Rupe a fiduciary duty also implicated capacity. The trial court specifically noted that Davis had "made another representation to the court that in [the defendants'] motion for summary judgment on September the 11th that [she] raised the issue that these defendants were sued in their wrong capacity." Davis responded "[a]bsolutely, 100 percent. The entire breach of fiduciary duty section is talking about the fact that these individuals do not own stock." The trial court indicated it was hard to believe that, from the breach of fiduciary duty argument, the case against the defendants should be dismissed because they had been sued in the wrong capacity.

A short time later, Davis's co-counsel, Katherine Elrich, attempted to address the court's concerns by stating, "please, accept our apologies if we've misstated this in today's argument. The point is that the argument [was] the individual defendants do not own stock, that that was put on notice then." The trial court then asked, "So would you agree that in your motion for summary judgment . . . that the lack of capacity issue was not raised for the court to make a decision upon which it could dismiss the case for that reason?" Elrich

responded, "Yes, Your Honor. It's not the lack of capacity argument."

Elrich's statement in her capacity as an officer of the court is some evidence from which the trial court could conclude that Davis misrepresented the contents of the defendants' motion for summary judgment. Davis asserted to the court that the motion for summary judgment filed three months earlier "absolutely, 100 percent" raised the issue of capacity and put Rupe on notice of the capacity problem. Based on this contention, Davis argued Rupe should not be allowed to file a trial amendment to correct the capacity problem and defeat the defendants' motion for directed verdict. Yet, Elrich agreed with the trial court that the motion for summary judgment did not raise the capacity argument that was the focus of both the defendants' request for a directed verdict and Rupe's request for a trial amendment. Even if the arguments made in the motion for summary judgment could be viewed as "related to capacity," as Davis argues, there is sufficient evidence to support the trial court's conclusion that Davis's statements about the contents of the motion for summary judgment were misleading.

A third misrepresentation alleged by Rupe concerned statements made by Davis about the production of documents. During trial, Rupe's counsel objected to the testimony of one of the defendants' expert witnesses on, among other grounds, the fact that the defendants had not produced any documents relating to the expert's opinions. Davis stated to the court that "[t]o the extent there are documents that reflect his opinions, they've been produced in the case." When the trial court asked whether a compensation study upon which the expert intended to rely had been produced, Davis responded "absolutely, it's been produced." Rupe's counsel then stated they could not find the study on the list of documents produced to them. Davis again insisted the document had been turned over stating, "I know that we produced copies of it." Finally, in the middle of the court's statement "[a]nd if you didn't produce that document …," Davis interrupted to reaffirm that "[t]he document has been produced." Three days later, Davis sent the trial court a letter stating that, upon review of the file, it was discovered that the compensation study had not, in fact, been produced.

Davis argues that her statements to the trial court were an honest and understandable mistake in light of the large number of documents produced in the case. Although Davis has asserted that she did not misstate the facts about producing the document on purpose, the trial court was free to disbelieve her claim that it was an innocent mistake. Davis further argues that her misstatements about the document were "innocuous" because they could not have caused any reversible error. But Davis's repeated, adamant, unqualified, and incorrect representations that the document had been produced, together with the other misleading statements discussed above, support the trial court's conclusion that Davis engaged in a pattern of misstating facts. A pattern of misstating facts to the trial court cannot be considered innocuous.[2] The record supports the trial court's conclusion that Davis engaged in a continuing course of conduct demonstrating a lack of candor with the court.

As stated above, there is sufficient evidence to support the trial court's findings

---

2. Rupe alleged numerous other misrepresentations in her third motion for sanctions. However, because we conclude the evidence supporting the misrepresentations discussed above is sufficient and those actions alone are enough to support the award of sanctions, it is not necessary for us to examine the remaining allegations.

that Davis engaged in a pattern of making misleading statements and misrepresentations, avoiding questions, and engaging in a lack of candor with the court. Again, we do not address whether the facts found by the trial court present an appropriate case for sanctions. Because of the arguments made in this appeal, our review has been limited to whether, when viewing the evidence in the light most favorable to the trial court's ruling, there is evidence to support its findings. And, although we share the dissent's concern about the possibility of sanctions having an adverse effect on zealous advocacy, we are confident that neither the trial court's ruling nor ours will discourage attorneys from representing their clients with zeal. Misstating facts or misrepresenting the record can never be justified under the guise of zealous advocacy. Nor should the requirement of complete candor with a court ever conflict with an attorney's ability to represent her client effectively.

Because there is evidence to support the findings, the trial court did not abuse its discretion in ordering the award of sanctions against Davis. We affirm the trial court's order.

FITZGERALD, J., dissenting.

Dissenting Opinion by Justice FITZGERALD.

I respectfully dissent. In my view, the conduct relied on by the majority as grounds for affirmance was not properly sanctionable under the trial court's inherent power to sanction. I would conclude that the trial court abused its discretion by sanctioning appellant.

### BACKGROUND

Appellee Rupe made three motions for sanctions in the course of this litigation.

In the first motion, Rupe asserted that the defendants' attorneys had sent certain letters to Rupe's prior attorneys, and that those letters misrepresented the contents of a discovery order signed by the court. The trial court denied that motion. This is not surprising, because according to each letter, the defendants' attorneys enclosed the court order in question. Thus, any misrepresentation about the court's order would have been singularly ineffectual.

According to Davis, Rupe filed a second motion for sanctions during trial.[1] Davis asserts in her brief, and Rupe does not dispute, that Rupe did not pursue the second motion for sanctions and the trial court never heard it. After trial and after the hearing of defendants' motion for new trial, Rupe filed her third motion for sanctions. Rupe asserted therein that Davis committed ten or eleven sanctionable acts in the course of the litigation. The trial judge signed a sanctions order that does not identify the sanctionable acts that he found Davis to have committed; rather, he remarks only that Davis committed sanctionable conduct "not once but on at least four (4) different occasions during trial, during the jury charge [sic] and during post-verdict motions." The trial judge's failure to make specific findings has significantly hampered the ability to review the sanctions order.

### DISCUSSION

#### A. Juror contacts

The first ground for sanctions considered by the majority is whether Davis misled the trial court with regard to her posttrial interviews with certain jurors. The majority concludes that the trial judge reasonably could have viewed Davis's affidavit regarding her posttrial interviews

1. The motion does not appear in the clerk's record.

with jurors as misleading. The majority also concludes that the trial judge reasonably could have found that Davis purposefully avoided answering the trial judge's questions about her juror contacts. I disagree.

### 1. Context: The motion for new trial

This issue had its genesis in the defendants' motion for new trial. The trial judge had previously signed a final judgment in favor of Rupe based on the jury verdict. The defendants' first argument in their motion for new trial was that Rupe's lawyer, Charla Aldous, made an incurable appeal to race during the questioning of defendant Paula Dennard "regarding the Rupe family's ties to an organization perceived to be tied to the KKK, and by focusing her closing argument on the concept of protection under the law for race, gender, and religion." First, they explained in their motion the nature of the inflammatory questioning and evidence:

> This improper argument started with Ms. Aldous's questioning of Paula Dennard regarding whether "Pops" (Ms. Dennard's father) left his leasehold interest in the Koon Kreek Klub to his kids and whether Ms. Dennard is still a member of the Koon Kreek Klub. (Ex. F at p. 10:18–23)
>
> Q: Okay. And—are you generally familiar with what this Will says about who Pops is gonna leave stuff to; are you not?
>
> A: I am.
>
> Q: And obviously, you would be interested in that because a lot of stuff was left to you?
>
> A: That's true.
>
> Q: Okay. Now, for instance, he left his interest in the house and leasehold at Koon Kreek Klub to his kids; did he not?
>
> A: If that's—that's what it says.

> Q: Are you still a member of the Koon Kreek Klub?
>
> A: No, I'm not.
>
> Q: You're not, okay.

(*Id.* at p. 10:11–24).

Ms. Aldous brought heightened attention to this improper and highly prejudicial argument not only by the oral testimony she elicited but also by publishing that particular provision of the will with Koon Kreek Klub highlighted, on a large overhead screen. In these ways, Ms. Aldous ensured the improper, prejudicial and irrelevant information was perceived by the jury in several ways: by auditory and visual references and by repetitive use of the name, "Koon Kreek Klub." The name of the club brings to mind racism not only by virtue of its historical ties to the KKK, but also by use of the word "coon" (an offensive racial epithet) and the initials "KKK."

The defendants went on to quote Aldous's closing jury argument that gave rise to their new-trial point:

> You know one thing that I think every single person in this courtroom would agree with me on is that we as United States citizens are proud of the fact and love telling people elsewhere that we do not live in an oppressed society. We do not oppress people based on their race, on their religion, whether they believe in God, whether they don't believe in God, whether they're male, female. We don't let you oppress our children.
>
> And what is so amazing about this system is that greatness about our country extends into this courtroom. For the law says if you are a majority shareholder in a corporation, you must treat all shareholders equally. You cannot oppress them because they are a minority. And that's exactly what we have here.

The defendants argued that the jury argument, in light of the earlier introduction of evidence about the Koon Kreek Klub, was improper and incurable under the recent decision in *Living Centers of Texas, Inc. v. Penalver*, 256 S.W.3d 678 (Tex.2008). The defendants did not allege jury misconduct, nor did they allege or even suggest that any juror commented on the Koon Kreek Klub during jury deliberations. The motion for new trial did not refer to any affidavits, and none were attached.[2]

The trial court held a hearing on the defendants' motion for new trial, and the incurable-argument point was the first point taken up at the hearing. At first, the argument focused on whether the *Living Centers* case was analogous to the instant facts. But then Rupe's attorney made an argument that the defendants had tried and failed to get affidavits from the jurors to support their incurable-jury-argument theory. The trial judge immediately began pressing the defendants' attorneys as to whether this was true. Defendants' attorneys stated that they had interviewed at least some of the jurors after the trial, and the trial judge questioned them as to the substance of those conversations. Davis suggests that the judge's questions on this subject were very confusing, and the trial judge acknowledged his own lack of clarity during one lengthy exchange:

> THE COURT: Excuse me. Your basis for a new trial, this highly prejudicial, irrelevant KKK, this is so egregious, this is exact—this is KKK, Nazi, Living Centers. You didn't ask one juror if that played a factor?

> DAVIS: It is egregious, Your Honor. It is egregious. And it cannot be waived.

> That being said, Your Honor, the jury's deliberation is beyond the purview of this Court. It would be improper to present evidence of the jurors' deliberations. And we have not done that nor did we ask the jurors about their deliberations. It was—it was actually fascinating when we spoke with the jurors.

> I only spoke with four jurors. Two of the four mentioned sua sponte, without any—without any probing or inquiry at all, that they were very taken aback and it was very impactful, this reference, not only to Koon Kreek Klub, but also the argument in closing argument that somehow shareholder oppression was akin to oppression based on race, gender, oppression to children.

> THE COURT: They were offended at Ms. Aldous' comments?

> DAVIS: I'm sorry. They were impacted. I did not ask them if they were offended. They were surprised and mentioned it to me, as I said, sua sponte. But the deliberations of the jury, again, not within the purview of the court. And we did not ask about that.

> CASADA [3]: And, Your Honor, if I may respond to Mr. Aldous' comments.

**2.** Toward the end of the hearing on the motion for new trial, the defendants adduced some live testimony from an expert witness with a background in communications studies and counseling development. The trial judge and the defendants' attorney referred to this testimony as a "bill of exception," apparently because Rupe's attorney complained that the witness had never been disclosed in discovery. The witness testified that references to "Koon Kreek Klub," including visual references, would probably imply to the jury that defendant Paula Dennard's father was a racist, and that the company was thus affiliated with a racist.

**3.** Hilaree Casada was co-counsel for the defendants.

ALDOUS: Your Honor, Ms. Bena-vides—and that's how I know her.[4] But she said that they did not ask the jurors questions about their deliberations because they know that's not appropriate.

On Exhibit No. 3 of their supplemental motion for new trial, they have an affidavit from Jarlon MaGee, who is a juror, and it says in paragraph 7, "I did not consciously approach my deliberations with bias. However, I understand that as a human being I'm impacted by my prior experiences."

For her to get up there and just say, right there, we did not ask them about deliberations and then for them to file this affidavit, it shows that the terrible inconsistencies and the misrepresentations made by the—to the Court by the defense counsel throughout this case.

And frankly, to require us to continually respond to these hyperbole and overstatement of arguments and cases that don't apply and documents that haven't been disclosed, frankly, I'm starting to get upset about it. And so I don't know what you're supposed to do about it, but I just wanted to say that.

CASADA: Your Honor, paragraph 7 didn't deal with his—the deliberations or discussions that went on within the jury box, who was voting for whom or—or what other people said. It was any dis- —his statement in his affidavit just related to his state of mind and how he went toward his deliberations. It wasn't—it's not testimony about what occurred during deliberations. And there's an important distinction there.

THE COURT: Okay. And you are telling this Court that this egregious, offensive, highly prejudicial, irrelevant statement contained in Exhibit 1 that y'all didn't object to, that you didn't ask for a mistrial, that y'all did absolutely nothing about, that during all these questions to all these jurors about possible misconduct that you didn't ask a single one of them that during the course of the trial leading up to the deliberations that that didn't play a factor, that that didn't cross their mind just like the—the fact that Juror MaGee's post-trial admissions about seeing several similarities between his family in this case and, you know, everything that was stated in his affidavit, you didn't do that on this issue?

DAVIS: Well, because I'm the one who spoke with some of the jurors. And again, Jennifer Duncan contacted others. She's luckily on her honeymoon right now in New Zealand as I understand. But what I can tell the Court is is, no, there was no discussion about, as Hilaree said, the content of the deliberations, who was voting for what, who—

THE COURT: That's not what I asked.

DAVIS: —who felt however they felt about a particular item.

THE COURT: No, I'm not asking—

DAVIS: One of the jurors—one of the jurors I did ask was there anything— was there anything during the trial that—

THE COURT: I'm going to stop you. I'm going to stop you. Apparently, I'm not being clear today. The same questions that were asked of these jurors and that you got Mr. MaGee to fill out an affidavit with respect to him

4. Apparently Davis's last name was Benavides at the time of the trial.

seeing several similarities between this case and his own personal experience during the course of this trial, those questions which apparently you think is proper and doesn't violate—is it 329(b) [5]—you didn't ask any one of these jurors during the course of litigation before they started deliberating, before the case was formally submitted to them, you didn't ask them, any of them, not one question about the Koon Kreek Klub exhibit?

DAVIS: Are you asking whether we spoke to the jury before they began deliberations? Absolutely not.

THE COURT: No.

DAVIS: Of course not.

THE COURT: Did you speak to Mr. MaGee before deliberations?

DAVIS: No, not outside the courtroom.

THE COURT: Well, in the same way, shape or form, however you communicated with Mr. MaGee, whether it be you or anyone at your firm, the same method that you used to contact these jurors and ask these questions to which resulted in an affidavit from Mr. MaGee saying that he saw several similarities and he didn't disclose the fact that he had a family member who was involved in something—I think you called it eerily similar.

DAVIS: No. But it was similar.

THE COURT: Similar. All right.

DAVIS: And those where the words of Mr. MaGee. But—

THE COURT: Eerily similar?

DAVIS: No. He didn't say eerily similar. The words in the affidavit are obviously his.

THE COURT: Okay. The methodology that y'all used to contact these jurors to talk to them about the questions that you asked them, obviously not during deliberations, but leading up to deliberations, you didn't ask any of them about Exhibit 1 and Koon Kreek Klub?

DAVIS: I—I don't know that—is the Court asking me whether we contacted the jury before they began deliberations? No. I don't—I want to make sure that I understand your question, Your Honor.

THE COURT: How did you contact Mr. MaGee? We'll be as simple as we need to be. How did you contact Mr. MaGee?

DAVIS: By telephone.

THE COURT: When?

DAVIS: I spoke with him within the last several weeks.

THE COURT: Okay. During the last several weeks I assume you called someone else besides Mr. MaGee on this jury.

DAVIS: That's true.

THE COURT: I would assume that your firm would have contacted every juror on this jury.

DAVIS: I don't know that that is true. I told you I contacted four jurors.

THE COURT: Well, who's the lead counsel in this?

DAVIS: I am.

THE COURT: As lead counsel you don't know whether or not your firm and the attorneys that work with you and under you, whether or not they contacted all 12 jurors to determine whether or not there was juror misconduct? That's what you're doing for your client?

5. Texas Rule of Civil Procedure 329b sets forth deadlines applicable to certain post-judgment motions; it does not address the subject of juror interviews after trial.

CASADA: May I answer that real quick, Your Honor. The calls to the jurors, as I understand it through my discussion with the trial team following trial, were your basic discussions to call the jury afterward and say: Hey, what did you think about the trial? Did we do anything, you know, wrong that you didn't like? You know, just typical juror questioning post trial as I've done and I've seen trial teams do after every large jury trial.

And what happened was, this evidence from Mr. MaGee, which is a separate—the jury misconduct issue is completely separate from the jury argument issue. It's our contention that this improper jury argument, first, we couldn't—we wouldn't be permitted to give you any testimony from a juror saying in my deliberations, you know, I you know, plus you wouldn't—be able to get this—but, you know, I felt like they were racists and I—you know, I voted against them on all those questions. The deliberations aren't within the purview. So—

THE COURT: I understand that.

CASADA: So that wasn't the intent to go out and seek information on juror misconduct. The fact—Mr. MaGee's juror misconduct was given to us by Mr. MaGee. I mean, we found out that he—he didn't disclose this very prevalent, important information that was—I agree with the description of Ms. Davis.

THE COURT: Fine. Did any of the jurors that you contacted, and unbelievably you didn't contact all of them, but that's between you and your client.

CASADA: Well, I'm not sure all the—I think when Ms. Davis—I'm not sure we got return calls from everyone.

THE COURT: Okay. Whoever returned your phone calls, none of—did any of them refer to Exhibit 1 or the Koon Kreek Klub as being offensive or—I thought—maybe I'm dream sequencing this. But I thought, Ms. Davis, you said that after the trial four jurors brought that up to you?

DAVIS: No, I contact—I spoke with four jurors. Two of those four did on their own without inquiry mention to me that they were surprised. We were asking questions to be—I was asking questions—

THE COURT: Who were they?

DAVIS: —better trial lawyer.

THE COURT: Who were they?

DAVIS: I spoke with Mike Kaden. I spoke with—

THE COURT: I want an affidavit. I want an affidavit from you telling me which jurors you spoke to that were quote-unquote surprised by Exhibit 1, the Koon Kreek Klub. Because I'm going to conduct in open court, as I'm allowed to do, and see if there was any—I'm going to see what was said and what they thought, if there's juror misconduct. Because I find it very hard to believe that your firm did not ask these people what you spent five hundred pages on trying to get a new trial.

DAVIS: Well—

THE COURT: And then we'll go from there.

From this point, the discussion moved to other topics. So the record shows aggressive questioning by the trial judge and answers by Davis that were responsive to the questions asked and at times sought clarification of the questions asked. The record shows that some answers were interrupted. On one occasion, the trial court cut Davis off completely from responding.

In sum, Davis's answers were reasonable and not evasive under the circumstances.

As for Davis's affidavit, the trial judge's instructions were specific: He requested an affidavit specifying which of the jurors that she spoke to were "surprised" by the reference to the Koon Kreek Klub in Exhibit 1. Davis supplied an affidavit that included the following paragraph:

> In answer to the Court's question, two of the four jurors I interviewed after the jury was discharged mentioned to me *sua sponte* that they recalled the reference to Koon Kreek Klub. One of the two jurors was Juror Douglas Pernell. My recollection is that the second juror was Mike Kadden. However, notes of my conversation with Mr. Kadden do not reflect a discussion of Koon Kreek Klub, in particular, so I may be mistaken. Due to my uncertainty as to the identity of the second juror who commented on the references, I am also providing the Court with a list of each juror that I personally spoke to after the jury was discharged. Those jurors are Jarlon Magee, Douglas Pernell, Mike Kadden, and Dale Perkins. The two jurors who mentioned the Koon Kreek Klub reference did not necessarily recall the exact details of Ms. Aldous' reference to these topics or the specific timing during the trial of such references. For example, in my conversation with Mr. Pernell on or about April 14, 2008, Mr. Pernell informed me he was "surprised" by what he recalled to be Ms. Aldous' reference to "Koon Kritter Kafe."

**2. The third motion for sanctions**

One week after the trial judge denied the defendants' motion for new trial, Rupe filed her Third Motion for Sanctions. In that motion, Rupe presented the following argument about Davis's contacts with the jurors:

> 2. On April 21, 2008, this Court held a hearing on Defendants' various post-trial filings. At that hearing, Defense counsel made certain representations to the Court concerning Defense counsel's contact with certain jurors. Counsel either represented to the Court, or implied to the Court, that counsel had not contacted jurors in an effort to find out if jurors remembered the phrase "Koon Kreek Klub" or if the phrase impacted their decision. Defense counsel informed the Court that she spoke with four jurors and that two "mentioned sua sponte, without any—without any probing or inquiry at all, that they were very taken aback and it was very impactful, this reference, not only to Koon Kreek Klub, but also the closing argument that somehow shareholder oppression was akin to oppression based on race, gender, oppression to children." The Court requested an affidavit from Defense counsel to that effect. (See Transcript of April 21, 2008 Hearing, p. 41, ll. 25–p. 51, ll. 5, attached as Exhibit 1).
>
> 3. Attached hereto as Exhibit 2 is the Affidavit of Dale Perkins, a juror in the trial of the case. Ms. Perkins' affidavit describes a telephone conversation with Amy Davis Benavides where Ms. Benavides asked Ms. Perkins if she remembered the evidence in "Pop's will" and other evidence of a racial character. Ms. Perkins affidavit shows that Defense counsel misrepresented her contact with at least one juror.

Thus, Rupe contended that Davis somehow misrepresented to the Court what happened and what was said in at least one of her juror interviews. Rupe attached several exhibits to the Third Motion for Sanctions, including an affidavit by juror Dale Perkins.

The trial court held a hearing on Rupe's Third Motion for Sanctions. Except for

the attorneys in the case, no witnesses were called to testify. Instead, Rupe relied heavily on the Perkins affidavit, arguing that it "shows that Defense counsel misrepresented her contact with at least one juror." The affidavit shows no such thing. In the affidavit, Perkins identified herself as a juror in the case and then stated as follows:

3. "On April 14, 2008, I received a telephone call from Amy Davis Benavides. Ms. Benavides asked me if I remembered when Charla [Aldous] introduced Pop's will during the trial. She also asked if I remembered any racial statements in the will. Ms. Benavides asked if I remembered "Cocoon" or "Coon" being mentioned or any other words of a racial character.

4. "I informed Ms. Benavides that I remembered Pop's will being discussed on several occasions during the trial, but I did not remember any specifics in the will. I also pointed out that race did not have anything to do with the trial because all of the parties were white."

Perkins's affidavit testimony simply did not contradict Davis's assertions either at the new-trial hearing or in her subsequent affidavit. Davis stated that she personally spoke with four jurors and that two of them, Douglas Pernell and Mike Kadden, raised on their own initiative the effect of the Koon Kreek Klub evidence. Davis never claimed that Perkins raised the Koon Kreek Klub evidence on her own initiative, nor did Davis deny that she raised the race issue with Perkins. Thus, Perkins's affidavit did not contradict Davis's account of her juror interviews, and Rupe's argument that Perkins's affidavit proved a misrepresentation by Davis was wrong.

During the sanctions hearing, the trial judge questioned Davis's attorney about what he perceived as Davis's failure to answer the first question he posed in the above-quoted transcript excerpt: "You didn't ask one juror if that [reference to the Koon Kreek Klub] played a factor?" The judge seemed to be of the view that because Davis did not orally answer his question at the time, she should have expressly stated in her affidavit that she took the initiative and raised the Koon Kreek Klub issue when she interviewed Perkins. But as Davis's counsel pointed out, the judge's instructions as to what Davis was supposed to include in her affidavit were narrower than that. At the new-trial hearing, the judge directed Davis to file an affidavit addressing only which jurors were surprised by the trial references to the Koon Kreek Klub. Davis complied with the court's order. Additionally, Perkins's affidavit recites she was asked about a particular will and whether she remembered any racial statements such as "cocoon" or "coon"; the affidavit never suggests that Davis asked her whether such statements played a factor in her mind in any manner (presumably in resolving the issues during jury deliberations).

### 3. Analysis

The trial judge abused his discretion to the extent he sanctioned Davis based upon her statements at the new-trial hearing and the contents of her subsequently filed affidavit. The affidavit was not sanctionable because it complied with the trial court's instructions and because Rupe adduced no evidence showing that it was false or even misleading in any respect. The judge wanted to know which jurors were surprised by the references to the Koon Kreek Klub, and Davis identified them in her affidavit by name.

As for Davis's oral assertions at the new-trial hearing about her juror interviews, Rupe does not identify a single falsehood among those assertions. As shown above, the ground for new trial under dis-

cussion was actually whether Rupe's closing jury argument was improper and incurable on its face. Because it was a facial challenge, this ground did not call for inquiry into whether any particular jurors were actually influenced by the argument.[6] Nevertheless, faced with a new-trial argument that basically accused Rupe's attorneys of race-baiting during closing argument, Rupe's counsel went on the attack by alleging that the defendants' lawyers "contacted every juror" to try to get an affidavit proving the negative effect of the Koon Kreek Klub evidence. This distraction tactic worked, because it triggered the trial judge's subsequent close questioning of the defendants' attorneys.

A fair reading of the colloquy between the trial judge and Davis shows the judge asked Davis if she questioned jurors about whether the racial statements in the will played a factor in jury deliberations. Davis responded that she never inquired into the content of the jury deliberations. The trial judge's follow-up questions related to the timing of Davis's questions, which caused Davis to strive to clarify what the trial judge was asking. The trial judge's inquiries did focus on whether Davis talked to jurors about the statements in the will before the jury began its deliberations. The fault lies in the trial judge's poorly formed questions, not in Davis's answers. Davis was within her rights to ask for the immediate clarification she sought. Then the trial judge changed course and said that he thought Davis had said that four jurors referred to the will or the Koon Kreek Klub as being offensive. Davis reminded the trial judge that only two jurors brought this up and

expressed surprise. At this juncture, the trial judge said it wanted Davis's affidavit naming those jurors who were surprised.

The following excerpts prove the point:

THE COURT: Okay. And you are telling this Court that this egregious, offensive, highly prejudicial, irrelevant statement contained in Exhibit 1 that y'all didn't object to, that you didn't ask for a mistrial, that y'all did absolutely nothing about, that during all these questions to all these jurors about possible misconduct that *you didn't ask a single one of them that during the course of the trial leading up to the deliberations that that didn't play a factor, that that didn't cross their mind* just like the—the fact that Juror MaGee's post-trial admissions about seeing several similarities between his family in this case and, you know, everything that was stated in his affidavit, you didn't do that on this issue?

DAVIS: Well, because I'm the one who spoke with some of the jurors. And again, Jennifer Duncan contacted others. She's luckily on her honeymoon right now in New Zealand as I understand. But what I can tell the Court is is, no, there was no discussion about, as Hilaree said, the content of the deliberations, who was voting for what, who—

(Emphasis added.) Given the length of the judge's question, asked orally in the course of a lengthy hearing, Davis's answer was neither unreasonable nor misleading. Later, the judge asked more questions:

---

**6.** In *Living Centers*, the Texas Supreme Court considered a closing argument in which the plaintiff's attorney analogized the defendants' conduct and defensive theory to the T–4 Project in Nazi Germany. 256 S.W.3d at 679–80. Based on the content of the argument alone, and without any evidence of its actual impact on the jurors, if any, the court reversed because the closing argument was improper, incurable, and "struck at the heart of the jury trial system." *Id.* at 682.

THE COURT: I'm going to stop you. I'm going to stop you. Apparently, I'm not being clear today. The same questions that were asked of these jurors and that you got Mr. MaGee to fill out an affidavit with respect to him seeing several similarities between this case and his own personal experience during the course of this trial, those questions which apparently you think is proper and doesn't violate—is it 329(b)—*you didn't ask any one of these jurors during the course of litigation before they started deliberating, before the case was formally submitted to them,* you didn't ask them, any of them, not one question about the Koon Kreek Klub exhibit?

DAVIS: Are you asking whether we spoke to the jury before they began deliberations? Absolutely not.

THE COURT: No.

DAVIS: Of course not.

. . .

THE COURT: Okay. The methodology that y'all used to contact these jurors to talk to them about the questions that you asked them, *obviously not during deliberations, but leading up to deliberations,* you didn't ask any of them about Exhibit 1 and Koon Kreek Klub?

DAVIS: I—I don't know that—is the Court asking me whether we contacted the jury before they began deliberations? No. I don't—I want to make sure that I understand your question, Your Honor.

(Emphases added.) Again, based on the confusing questions the judge asked, Davis's answers were reasonable and responsive. Finally, it is plain that the judge himself was confused about what Davis had said, based on the following exchange:

THE COURT: Okay. Whoever returned your phone calls, none of—did any of them refer to Exhibit 1 or the Koon Kreek Klub as being offensive or—I thought—*maybe I'm dream sequencing this. But I thought, Ms. Davis, you said that after the trial four jurors brought that up to you?*

DAVIS: No, I contact—I spoke with four jurors. Two of those four did on their own without inquiry mention to me that they were surprised. We were asking questions to be—I was asking questions—

THE COURT: Who were they?

DAVIS: —better trial lawyer.

THE COURT: Who were they?

DAVIS: I spoke with Mike Kaden. I spoke with—

THE COURT: I want an affidavit. I want an affidavit from you telling me which jurors you spoke to that were quote-unquote surprised by Exhibit 1, the Koon Kreek Klub. Because I'm going to conduct in open court, as I'm allowed to do, and see if there was any—I'm going to see what was said and what they thought, if there's juror misconduct. Because I find it very hard to believe that your firm did not ask these people what you spent five hundred pages on trying to get a new trial.

(Emphasis added.) Once Davis corrected the judge and said that two jurors brought the issue up on their own initiative, the judge focused sharply on those two jurors. And Davis ultimately answered his concern in her affidavit.

In sum, I cannot agree with the majority's conclusion that a reasonable trial judge could view Davis's affidavit as misleading, nor can I agree with the majority that a reasonable trial judge could find that she purposefully avoided answering any of the trial judge's questions.

## B. The "wrong capacity" argument

Next, the majority concludes that the trial judge acted reasonably by finding that Davis misstated arguments that had been presented in defendants' motion for summary judgment. This basis for sanctions is unlike the first and third bases discussed by the majority, because this basis does not involve matters of historical fact, i.e., things the lawyer did or did not do. Rather, this basis for sanctions concerns a lawyer's legal argument about the implications of the contents of a prior motion that was on file and, so to speak, right in front of the trial judge's eyes. I respectfully disagree with the majority's conclusion, and I believe that the majority's analysis will have a chilling effect on attorneys' ability to discuss matters on file with the court.

This is Rupe's argument in support of this ground for sanctions in her Third Motion for Sanctions:

> 9. After Plaintiff made a motion for a trial amendment, Defendants' counsel took the position that they had to offer evidence of "surprise" and called Ms. Benavides as a witness. At that time, Ms. Benavides represented to the Court that Defendants raised the issue of capacity in Defendants' motion for summary judgment. Ms. Benavides made this statement so that it appeared that Defendants gave Plaintiff notice of their defense before Defendants filed their amended answer. In reality, Defendants' motion for summary judgment did not raise Defendants' capacity as a defense.

A subtle but significant distinction appears even within Rupe's own argument: Davis represented to the trial court that she had "raised" the issue of capacity in her motion for summary judgment, but Rupe sought sanctions because the summary-judgment motion "did not raise Defendants' capacity *as a defense.*" (Emphasis added.)

### 1. Facts

During the trial, the defendants sought a directed verdict on the ground that they had been sued in the wrong capacity—that is, had been sued individually instead of as trustees. Rupe sought leave to file a trial amendment changing the capacity in which the defendants were sued. The question then arose as to when and how the defendants had put Rupe on notice of their position that she had sued them in the wrong capacity. Davis testified at the hearing on Rupe's request to file the trial amendment. During her direct examination, Davis took the position that she asserted "lack of capacity" in a verified denial filed 30 days before trial, and that lack of capacity had been part of her defense of the case since the filing of defendants' motion for summary judgment three months before trial:

Q: Did you file a verified denial alleging lack of capacity in this lawsuit?

A (Davis): Yes.

Q: Was that filed in your first amended petition [sic]?

A: Yes.

Q: Was that filed on November 9th, 2007?

A: Yes.

. . .

Q: You also filed a motion for summary judgment in this case?

A: Correct.

Q: And in that motion for summary judgment did you raise the argument that none of the individual defendants owned a majority interest in Rupe Investment Corporation in the breach of fiduciary duty argument?

A: Yes.

Q: And did you also include an affidavit of Mr. Lee Ritchie explaining the percentage of ownership of Rupe Investment Corporation?

A: Yes.

Q: And you filed that motion for summary judgment on September 11th, 2007?

A: That's my understanding.

Q: So part of your defense in this case has been a lack of capacity argument?

A: Correct.

Thus, on direct examination, Davis testified (1) that the wrong-capacity defense was alleged in the amended pleading filed about 30 days before trial, and (2) that certain arguments were made and certain facts were proved in the motion for summary judgment filed three months before trial. She then concluded with a legal deduction, that the wrong-capacity defense had been "part of [the] defense in this case"—*not* with a factual statement that she had asserted a wrong-capacity defense as an independent ground for summary judgment. But Rupe's counsel cross-examined Davis as though that were the position she had taken:

Q: Ms. Benavides, you represented to the Court in your testimony that you raised the issue of capacity in your summary judgment motion. Let me hand you your summary judgment motion. You show me exactly where and tell the Court exactly where it is in there that you raised the issue of the capacity of the defendants in your motion for summary judgment.

A: Well, one—in one place, Page 23, footnote 4, speaks specifically about the fact that none of the individual defendants own a majority interest in Rupe Investment Corporation. And it then goes on to talk about the fact that Paula Dennard owns stock only as a beneficial owner, and that means as a beneficial owner of the Paula Rupe Dennard Management Trust.

Q: Ma'am, does it say capacity in that footnote for your 50 page motion?

A: No, it doesn't say capacity.

Q: Any other place in there that you want to refer the Court to, to support your statement that you made an argument in your motion for summary judgment concerning the capacity in which the defendants have been sued?

A: Well, that's the necessary implication of that footnote.

Q: Do you want to answer the question I asked? Do you have any other place other than Footnote 4 in your motion for summary judgment to support your statement that you raised the capacity of the defendants in your motion?

A: Yes, sir. The entire breach of fiduciary duty argument.

Q: I want you to show the Court one place where you said capacity of the defendants—show the Court one place.

A: Mr. Aldous—

Q: Can you do it?

A: Yes.

Q: Show it.

A: The entire breach of fiduciary duty.

Q: Do you know what it means to—

THE COURT: Let her finish her answer.

THE WITNESS: The entire breach of fiduciary duty section discusses whether or not these individual defendants owe a fiduciary duty to the plaintiff as a majority shareholder. And the entire—the implication and

the entire point of that is, as individuals they are not majority shareholders.

Q: Can you show the Court the word "capacity" written in your motion anywhere without looking to your lawyer for help?

A: I—well, I'm not looking to my lawyer for help.

Q: Then why are you looking at her paper?

A: Well, I think—

Q: Can you do it?

A: The term "capacity" is not used. Although—

Q: Okay. Thank you.

A: —words such as beneficial, owner, individuals, et cetera, which all implicate capacity.

THE COURT: Ms. Benavides—hold on. I'm sorry, Mr. Aldous, to interrupt you—are you trying to tell me that in a motion for summary judgment in which you want a court to dismiss an entire lawsuit that the court has to have—that you're doing that by implication rather than the English language? Is that what you're trying to tell me?

DAVIS: No, Your Honor, I'm not.

THE COURT: Because you just made another representation to the Court that in your motion for summary judgment on September the 11th that you raised the issue that these defendant were sued in their wrong capacity.

DAVIS: Absolutely, 100 percent. The entire breach of fiduciary duty section is talking about the fact that these individuals do not own stock. Your Honor—

THE COURT: Mr. Aldous, I've read it. I don't need to see it. I know it's not in there.

DAVIS: Well, and, your Honor, I believe that it's only fair to bring to the Court's attention that the pleadings on file for the plaintiff do not—do not say specifically that she's trying to lump these folks together as trustees. So it would be—

THE COURT: You're saying that your firm in which you're a partner of, when they—if they were to try to dismiss this case on the basis that the plaintiffs have sued the defendants in the wrong capacity, i.e., they sued them as individuals rather than as trustees, that the proper work product coming from your firm is to file a 50 page motion for summary judgment in which in the 50 pages the law firm representing these defendants are not going to tell the court that the case should be dismissed because they're being sued in their wrong capacity, that I have to imply it from the 50 pages and imply it from a breach of fiduciary duty argument; that's what you're trying to tell me?

DAVIS: Well, no. I don't—

THE COURT: This is like the third or fourth misrepresentation you've made to me during this trial. And when you tell the court, when you tell the judge that this has been raised months before, that the lack of capacity—you know, being sued in their wrong capacity issue was raised since September 11th, what if I didn't read your motion? What if I was just a judge that took lawyers for their word and I made a decision based on what you were telling me? I mean, that's problematic to me.

Davis relied specifically on footnote 4 in the motion for summary judgment as having the "necessary implication" that Rupe sued the defendants in the wrong capacity, so I quote that footnote:

A majority shareholder may owe a fiduciary duty to a minority shareholder in certain limited situations, none of which exist here. [Citation omitted.] More importantly, however, none of the Individual Defendants own a majority interest in RIC. Exhibit 24 of the Ritchie Affid. at ¶ B. Defendant Paula Rupe Dennard holds only approximately 18% ownership in RIC and as beneficial, not record owner at that. *Id.* Defendant Ritchie holds approximately a mere 1% ownership interest and Defendant Lutes owns no RIC stock at all.

### 2. Analysis

Davis did not misrepresent the contents of her motion for summary judgment. First, I review her testimony on direct examination. She testified that she argued in the summary-judgment motion that the breach-of-fiduciary-duty claim should be dismissed because "none of the individual defendants owned a majority interest in Rupe Investment Corporation." She also testified that she "include[d] an affidavit of Mr. Lee Ritchie explaining the percentage of ownership of Rupe Investment Corporation." After this testimony, she agreed that "part of [the] defense in this case has been a lack of capacity argument." Although she did not spell out the logical steps connecting the facts and her conclusion, I think they are readily apparent. Rupe sued the defendants in their individual capacities only. She alleged that the defendants were majority shareholders who had oppressed her as a minority shareholder. But, as proved in the summary-judgment motion, the defendants in their individual capacities were *not* majority shareholders. Most of the company's stock was owned by various trusts. So when the defendants argued on summary judgment that they did not own the company's stock and so owed Rupe no fiduciary duties, Rupe should have realized that her shareholder-oppression theory was flawed for basically the same reason: the defendants in their individual capacities did not own a majority of the stock. Davis's position was legally reasonable, defensible, and accurate.

Davis's testimony on cross-examination was consistent with her testimony on direct. When Rupe's attorney asked her where she "raised the issue of capacity" in the summary-judgment motion, she pointed to footnote 4 and the entire breach-of-fiduciary-duty section of the motion. She readily acknowledged that footnote 4 "doesn't say capacity," but she explained that a capacity problem is "the necessary implication of that footnote." When Rupe's counsel interrupted her on another occasion, and the trial court allowed her to finish her answer, Davis said, "The entire breach of fiduciary duty section discusses whether or not these individual defendants owe a fiduciary duty to the plaintiff as a majority shareholder. And the entire— the implication and the entire point of that is, as individuals they are not majority shareholders." So Rupe's counsel retreated and asked her whether she used the very word "capacity" in her motion, and she stated that she did not—but she had never claimed the contrary, so her statement was accurate and innocuous. But at that point the trial judge began questioning Davis himself, and he plainly started with the erroneous assumption that Davis had testified that wrong capacity was a full-blown ground for summary judgment presented in the motion:

> Ms. Benavides—hold on. I'm sorry, Mr. Aldous, to interrupt you—are you trying to tell me that in a motion for summary judgment in which you want a court to dismiss an entire lawsuit that the court has to have—that you're doing that by implication rather than the English lan-

guage? Is that what you're trying to tell me?

She had not testified to that effect, and the trial judge erred to the extent he found otherwise.

The majority finds an evidentiary basis for the trial judge's finding by concluding that Davis's co-counsel, Katherine Elrich, contradicted Davis's description of the motion for summary judgment. I do not agree with that conclusion. This is what the transcript shows:

> ELRICH: Your Honor, if I may, what we're asking the Court to do is enter a directed verdict based on the lack of capacity. And if I just may briefly, if you'd just indulge me for just a second on this issue with respect to the motion for summary judgment. The argument when you read the motion for summary judgment, the point— and, please, accept our apologies if we've mis-communicated this in today's argument. *The point is that the argument is that the individual defendants do not own the stock, that that was put on notice then.* As we further got into the case, we realized that we needed to raise the lack of capacity, that term "lack of capacity" under Rule 193—or, I'm sorry, not Rule 193—Rule 93, excuse me, as a verified denial. And so that's what caused us to file an amended petition—or, an amended answer 30 days before trial.
>
> THE COURT: So you would agree that in your motion for summary judgment, that was filed for the first time on September 11th, that *the lack of capacity issue was not raised for the Court to make a decision upon which it could dismiss the case for that reason?*
>
> ELRICH: Yes, Your Honor. It's not the lack of capacity argu-

ment. The argument is, is that they were on notice they had—that the individual defendants themselves do not own the stock in the breach of fiduciary argument [sic].

(Emphases added.) In my view, Elrich's statement is consistent with Davis's testimony: the motion for summary judgment "raised" capacity in the sense that it gave Rupe notice that she had erroneously sued the defendants individually and not in their capacities as trustees. The trial judge was obviously still laboring under the misapprehension that Davis had claimed that she had sought summary judgment based on an independent ground of wrong capacity. So when Elrich said, "Yes, Your Honor. It's not the lack of capacity argument," she plainly meant that the defendants had not made wrong capacity a full-blown, independent ground for summary judgment. But Davis never claimed that they had. And Elrich immediately reiterated Davis's true point, which was that the summary-judgment motion gave Rupe notice that the defendants did not own a majority of the stock in their individual capacities. In my view, Elrich did not contradict Davis's testimony or supply any evidence that Davis's testimony or arguments were misleading.

Plainly, this issue related to a hotly contested motion, and Davis took the position that the summary-judgment motion put Rupe on notice that she had sued defendants in the wrong capacity. But in my view, Davis did not misrepresent the contents of the motion for summary judgment. A reasonable trial judge could not put such an interpretation on her testimony.

## C. Incorrect assertion that a document had been produced in discovery

Finally, the majority relies on Davis's erroneous assertion to the trial court that

a certain document had been produced in discovery when in fact it was not. Davis acknowledged that she made this statement to the trial court in error. In fact, she sent a letter to the court and opposing counsel three days after she made the assertion, advising that she had been mistaken and apologizing for the error. Thus, it is established that Davis did make an erroneous statement of fact to the trial judge about the production of the letter.

Nevertheless, I would conclude that the trial court could not sanction Davis for this misstatement of fact. The majority first reasons that the trial judge was free to disbelieve Davis's claim that her mistake was an innocent one. I disagree. Davis promptly came forward, admitted her error, and apologized to the trial court and opposing counsel. This course of conduct is totally inconsistent with the proposition that Davis knowingly lied when she said that the document had been produced. The document was never offered into evidence, so if she knowingly lied about its production she had no reason to come forward and admit the misstatement once the trial had moved on. Moreover, the trial judge himself at one point complimented the parties on their thoroughness during discovery, remarking, "I'm glad y'all are working together. And, you know, you have thousands of documents. To miss one or two, I mean, that's pretty awesome." The only reasonable conclusion is that Davis told the truth when she said that the mistake was an honest one. Thus, there is no evidence that Davis made the misstatement in bad faith. *See IFC Credit Corp. v. Specialty Optical Sys., Inc.*, 252 S.W.3d 761, 772 (Tex.App.-Dallas 2008, pet. denied) (noting that inherent power to sanction exists "to deter, alleviate, and counteract **bad faith** abuse of the judicial process") (emphasis added). Second, the majority reasons that Davis's misstatement cannot be considered innocuous

because it was part of a larger pattern of factual misstatements. For the reasons previously stated, the record shows that Davis did not engage in a continuing course of conduct demonstrating a lack of candor to the court.

One final matter must be noted in connection with this issue. Davis erroneously told the trial court that two documents had been produced when in fact they had not: a set of handwritten notes and a compensation study. During oral argument before this Court, Rupe's counsel asserted that he still had never seen the notes, and he also asserted that the compensation study was "never produced." On rebuttal, Davis's counsel pointed out that the appellate record contains Davis's apology letter to the trial court and to opposing counsel regarding the nonproduction of those documents. According to the letter, copies of the documents were enclosed and sent both to the trial court and to opposing counsel. Rupe's counsel has filed no supplemental briefing in our Court denying that he received those documents as stated by Davis in the letter. This omission is tantamount to a concession that he was wrong when he told this Court that the documents were never produced. Davis's attorney charitably characterized Rupe's counsel's assertions as a "mistake" during his rebuttal. My point is simply this: in a long and complicated piece of litigation like this case, lawyers on all sides are going to make mistakes. If they want their own mistakes to be judged charitably, they themselves should be slow to reach for the "nuclear weapon" of sanctions against their opponents.

### D. Conclusion

"The amorphous nature of a trial court's inherent power to sanction and its potency demands sparing use." *Greiner v. Jameson*, 865 S.W.2d 493, 499 (Tex.App.-Dallas

1993, writ denied). We enforce this principle by requiring evidence of both bad-faith litigation conduct and significant interference with the court's exercise of its traditional core functions.[7] Otherwise, we risk discouraging attorneys from representing their clients with the zeal that is contemplated by our rules of professional conduct and essential to the proper functioning of our adversarial system. In my view, the conduct discussed by the majority was not bad-faith litigation conduct that significantly interfered with the trial court's core functions. I would conclude that the trial court abused its discretion, and I would reverse the order imposing sanctions.

7. Although Davis does not point it out, I would also note that the trial court erred by failing to set forth *how* Davis's supposedly sanctionable conduct interfered with the court's core functions. This requirement also helps to ensure that the inherent power to sanction is exercised only in appropriate cases. *See Sims v. Fitzpatrick*, 288 S.W.3d 93, 106 (Tex.App.-Houston [1st Dist.] 2009, no pet.) ("[A] trial court must make findings to support its conclusion that the conduct complained of significantly interfered with the court's legitimate exercise of its core functions.") (internal quotations omitted); *accord IFC Credit*, 252 S.W.3d at 772.